Dtjkfee, Judge,
delivered the opinion of the court:
The claims of the three plaintiffs herein were referred to the court by Private Law 85-713,85th Congress, approved August 27, 1958 in accordance with sections 1492 and 2509 of Title 28 of the United States Code. By this Act, the *663 court was requested to report to the Committees on Judiciary of the Senate and House of Representatives as to “the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts over and above the amounts paid pursuant to the first section of this Act, if any, legally or equitably due from the United States to any such claimants.”
Plaintiffs were entertainers engaged by Camp Shows, Inc., a private voluntary nonprofit New York Corporation, organized for the purpose of providing professional entertainment to the Armed Forces of the United States in World War II. Camp Shows, Inc., was a member agency of, and received its funds from, the United Service Organization, a private agency generally known as the U.8.O., which was supported by voluntary contributions of the American public to provide hospitality and entertainment to its servicemen. Camp Shows received no direct financial support from the defendant, the United States.
Defendant’s War and Navy Departments cooperated with Camp Shows in the case of entertainers going overseas, by issuing invitational orders, and arranging and providing for transportation facilities. Camp Shows procured the entertainers and paid them either a salary, or in the case of prominent, highly paid entertainers, a nominal daily allowance for incidental expenses.
Under this form of arrangement, plaintiffs signed agreements with Camp Shows to entertain overseas as part of a troupe, along with the husband of plaintiff Rosen, and three other professional entertainers. The War Department issued invitational travel orders to plaintiffs, issued travel priorities and arranged and paid for their transportation by a commercial airline company, Pan American Airways.
Although plaintiffs knew they were going overseas, they were not advised as to destination or where they would entertain servicemen. When they boarded the seaplane at New York none of the plaintiffs were informed of the provisions of the international Warsaw Convention, which limited the liability of the carrier to $8,291.87 per passenger for injuries except in case of willful misconduct of the carrier.
*664 None of tlie plaintiffs had any opportunity to procure accident or life insurance for the trip, and Camp Shows did not provide any such insurance.
On February 22,1943, the Pan American seaplane, Yankee Clipper, left New York City with plaintiffs and their troupe on board, and crashed the next day, February 23,1943, into the Tagus River while attempting to alight at the Port of Lisbon, Portugal. Twenty-three persons were killed in the accident, including plaintiff Rosen’s husband; several others were injured, including plaintiffs herein.
Under the terms of reference by Congress to this court, we are called upon to determine whether plaintiffs have a legal or equitable claim against the United States, over and above the amounts already paid to plaintiffs by the Government pursuant to this Congressional private law.
Section 1 of the Act provided for payment to each of the plaintiffs of the amounts they would have received if they had been employees of the Government when injured, under the compensation provisions of the' Federal Employees Compensation Act of 1916, 39 Stat. 742.
In addition, as hereinbefore stated, the Act called upon the court to “give consideration to any questions of law or fact which may be stated in letters transmitted to the court by the Chairman of the Committee on the Judiciary of the Senate and the Chairman, of the Committee on the Judiciary of the House of Representatives within ninety days from the date of the enactment of this Act.”
The letter from the Chairman of the Judiciary of the Senate to the court referred to the payments already made by the United States to plaintiffs under Section 1 of the Act pursuant to the compensatory provisions of the Federal Employees Compensation Act of 1916. The Chairman’s letter asked us to first determine whether the amendments to the 1916 Employees Compensation Act adopted in 1949 “would be the more appropriate yardstick inasmuch as the accident out of which these claims arise occurred in 1943,” since this was suggested during the Senate hearings.
Plaintiffs have already been paid by the Secretary of the Treasury under Section 1 of the Private Act, the commuted value of the sum which would have been paid to a Federal *665 employee injured in February 1943, using the provisions of the Federal Employees Compensation Act of 1916 as the yardstick for payment to plaintiffs in the following amounts:
Jane Froman_$23,403. 68
Gypsy Markoff_ 23,403. 58
Jean Rosen (formerly the widow of Roy Rognan who was killed in the accident)- 24, 625.30
By formal stipulation filed June 14,1961 the parties agreed in part as follows:
1.The total maximum amount of monthly disability payments from date of the accident, February 23, 1943 to October 31,1949, inclusive:
Jane Froman_$9,368.00
Gypsy Markoff_ 9, 368, 00
Jean Rosen_ 9, 368.00
2. Utilizing the amount of the maximum payment under the Act as amended in October 1949, plaintiffs would have received in monthly disability payments from November 1, 1949 to December 31, 1960 inclusive:
Jane Froman_$70, 350. 00
Gypsy Markoff_ 70,350.00
Jean Rosen_ 70,350. 00
3. The commuted value of future maximum monthly payments under the 1949 amendment as of January 1, 1961:
Jane Froman_$78,106.00
Gypsy Markoff_ 78,106.00
Jean Rosen_ 85, 710. 00
By applying the 1949 amendment to the 1916 Act as a yardstick, as though plaintiffs were actually employees of the United States when injured in 1943, the additional award to plaintiffs of the amounts computed under subparagraphs (1), (2), and (3) above, and the total awards to plaintiffs would be as follows, as of January 1,1961:

*666 By the 1949 amendment to the Federal Employees Compensation Act, the maximum yearly coverage was raised from $1,400 to $6,300. The purpose of this increase was to enable the disabled Government employee or the family of a deceased employee to “meet ordinary living expenses under prevailing economic conditions” and, “as a matter of common justice * * * to restore to government employees that measure of security necessary to enable them to maintain themselves.” [1] We cannot find in this basic purpose of the 1949 amendment any comparable standards for the full reimbursement allowed under the amendment, to these plaintiffs who chose their own outstanding careers in professional entertainment, and for whose economic security the Government is under no legal or moral obligation comparable to that which it owes to its own employees enjoying substantially different economic status.
Another question put forth by the Senate Committee letter was the matter of possible compensation of plaintiff Eosen by virtue of the death of her late husband and partner, Eoy Eognan, in the 1943 accident. Plaintiff Eosen has already recovered in settlement of the suit against Pan American Airways, in her capacity as administratrix of the estate of her husband, Eoy Eognan, payment of $8,300 for his death, and $750 for loss of his personal property. By again using the Federal Employees Compensation Act as a yardstick as was done by the Congress in measuring its award to plaintiff Eosen, we find that she would have received $61.25 a month from the date of Eoy Eognan’s death on February 23, 1943, to the date of her remarriage on April 13,1946, for the 38 months she was a widow, the sum of $2,327.50.
The Senate Committee also stated that it wished to have the benefit of our determination in regard to the following question: “What amounts of medical expenses were incurred by any of these claimants from injuries growing out of the accident?”
In her petition, plaintiff Froman asked for reimbursement of her medical expenses of approximately $140,000. She *667 suffered unusually severe personal injuries which, are described in detail in our specific findings. These injuries necessitated an extensive series of complicated operations with long periods of hospitalization and medical care as specified in the findings. The cumulative effect of this experience resulted in intermittent dependence on narcotics and repeated relapses of her injuries and constant pain and suffering.
During the period from 1944 to 1947, Miss Froman was under the added tensions and pressures of an outstanding-professional entertainer and singer in constant public performances. By the end of 1947 plaintiff Froman was in an extremely tense and depressed state of mind. During the period of over two years, from 1948 to 1950 she received extensive treatment and hospitalization for her mental condition at the Neurological Institute of the Presbyterian Hospital in New York City, and at the Menninger Foundation, more specifically referred to in our findings. From 1950 on, she has been a patient of an eminent psychiatrist in New York City, while still carrying on her remarkable public career. She was also subjected to several operations and periods of hospitalization in 1957,1958 and 1959, resulting from a herniated spinal disc in the lower back caused by a substantial tilt of her pelvic bone structure which developed from the shortening of her fractured right leg. We find that since February 23,1943, this plaintiff has expended the total sum of $94,213.14 for medical, surgical, hospital and psychiatric treatment necessarily required for and resulting from the injuries sustained by her in the seaplane crash. She has had Federal income tax savings since the seaplane crash in the amount of $11,370 on account of deductions in her tax returns up to 1961 for medical expenditures incurred for treatment and cure of her injuries.
Plaintiff Rosen sustained severe personal injuries in the seaplane crash, including injuries to her head, mouth, and teeth; hands and legs, including fractures in the right leg and ankle for which she received extensive medical, orthopedic and hospital treatment. We find that since February 23,1943, plaintiff Rosen has expended the total sum of $8,625 *668 for medical, surgical, dental, hospital, and chiropractic treatments necessarily required for, and resulting from, the injuries sustained by her in the seaplane crash. Plaintiff Eosen has had Federal income tax savings since the seaplane crash in the amount of $252.24 on account of deductions in her tax returns up to 1961 for medical expenditures incurred for treatment of her injuries.
Plaintiff Markoff sustained severe injuries to her hands, back, right shoulder, and right arm, for which we find that she has expended the total sum of $7,810 since February 23, 1943, for medical, surgical, and hospital treatment necessarily required for, and resulting from, her injuries in the seaplane crash. Plaintiff Markoff had no Federal income tax savings from these medical expenditures.
We are also asked by the Senate Committee to consider “the question of any possible payments by the Government in light of the receipt by any of the claimants of any contributions by persons or organizations made to assist the claimants in defraying any of their medical expenses.” Each of the plaintiffs received $3,600 as a gift from Camp Shows. Plaintiffs Froman and Markoff also each received a contribution of $8,300 from Camp Shows. Plaintiff Froman received an additional contribution of $2,040, Eosen $490, and Markoff $5,125 from Camp Shows. Camp Shows also expended $1,172.16 for plaintiff Markoff to replace personal property lost by her in the seaplane crash. Plaintiff Markoff also received a total of $36,000 in contributions from friends and her former fiancee.
If the payments already made by the Government and by Pan American Airways in settlement of its liability to plaintiffs from the seaplane crash are added to the contributions above listed in connection with the medical expenses of plaintiffs, the payments and donations to plaintiffs are as follows:

*669 The final question referred to the court by Sec. 2 of the Private Law, supra, inquires as to “the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts over and above the amounts paid pursuant to the first section of this Act, if any, legally or equitably due from the United States to any such claimants.”
The Report of the Committee on the Judiciary of the Senate dated August 12,1958, included amendments, and one of the purposes of the amendments stated in the report was:
(3) To refer the claims of each of the three claimants to the Court of Claims for the court’s determination and report to the Congress of any further claim, legal or equitable, against the United States. (Emphasis supplied.)
From the language of the Act and the Report of the Senate Committee, it would appear that the Congress has already determined that plaintiffs had a claim in equity against the Government upon which payment has been made, and has directed the court to find if there is any further claim in equity, beyond the payments already authorized by the Congress.
The parties to this litigation have stipulated that the United States is not presently liable in law on any account to plaintiffs. The Government did not employ plaintiffs to entertain United States troops. It did not select them or pay their salaries or allowances. While the Government paid and arranged for priorities for plaintiffs’ airline transportation, it did not arrange for the delivery of the airline tickets to plaintiffs. The subsequent seaplane crash was not the result of any negligent action by the United States, nor was it caused by enemy action or hostilities. The stipulation by the parties that there was no liability in law to plaintiffs is in accord with the facts and the law.
The term “equitable claim” as used in section 2509 of Title 28 of the United States Code, under which this matter is referred to the court, is not used in its strict technical sense meaning a claim involving considerations of right and justice as administered by courts of equity, but in a broader moral sense based upon more general equitable consideration. Burkhardt et al v. United States 113 Ct. Cls. 658 (1949).
*670 In United States v. Realty Company, 163 U.S. 427 (1896), the Court said (at page 440) :
* * * The nation, speaking broadly, owes a “debt” to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded. * * *
We consider that the earnings of plaintiffs after the accident, as compared to their earnings prior thereto, are relevant in considering any further equitable claims they may have.
After the accident, plaintiff Jane Froman earned gross income, as specified in our findings, from 1944 to July 1960 totaling over $1,450,000.00. However, her average annual earnings have substantially decreased and her career has been largely curtailed within the four years prior to 1961. We do not have a record as to her 1961 earnings, but it appeared that in 1960 she had been so emotionally and physically debilitated that she had repeatedly suffered complete collapse and had been unable to fulfill contract obligations, resulting in cancellation of some of her professional engagements.
Despite the testimony of her psychiatrist in 1960 that she was unable to undergo an independent mental and physical examination during 1960 at the request of the Government in this case, she was able to fulfill five days of a two-week engagement in Washington; a live television performance on the Bell Telephone Hour; a filmed television appearance on the Arthur Murray Show; a live television appearance on the Arthur Murray Show in which she won a dancing contest with her partner; and part of a three-week engagement at the Fairmont Hotel in San Francisco, with total earnings for the first six-month period in 1960 of $18,200.00. During 1959 she earned a total of $36,000.00 for a three-week night club engagement in Chicago, and a six-week engagement at a prominent New York City Hotel. We have no record before us of plaintiff Jane Froman’s earnings in 1961.
*671 Prior to 1943, plaintiff Markoff was an outstanding professional solo accordionist who earned as high, as $500 a week. After the accident, due to the severe permanent injuries she sustained, as described in our findings, her ability to obtain employment and her earnings were substantially diminished. From 1945 through 1950 her gross professional earnings averaged about $7,000 a year. Since most of her performances from 1951 through 1958 were overseas, there is no tax record of her earnings for that period. In 1959, her gross earnings were $2,261.
Before the accident in 1943, plaintiff Rosen and her partner were an outstanding comedy and acrobatic dancing team on the stage, and in moving pictures. During 1941 and 1942, their joint earnings were over $44,000. As a result of her severe permanent injuries sustained in the seaplane crash, as described in our findings, she was unable to perform as a dancer, but did earn an average of about $8,000 a year from 1944 through 1950. She has not been able to appear anywhere as an entertainer since 1951 because of her injuries.
The usual measure of recovery used by courts in actions at law for personal injuries cannot be applied by this court as to these plaintiffs since they have no case in law or equity in the strict legal sense. We can do no more than arrive at a general conclusion as to any further claims beyond the present congressional awards to plaintiffs under the broad equitable considerations as stated in the terms of reference from the Congress.
In response to the specific questions referred to us by the Congress as to Jane Froman, we submit the following findings summarized from our more specific findings herein:
Total additional compensation computed under Federal Employees Compensation Act as amended in 1949— $134, 420. 42
Total medical expenses-$94,213.14
Federal tax savings on above as deduc-tions_ 11,370. 00
Net medical expense___ 82, 843.14
Total gifts and recoveries- 46,393.00
Gross earnings 1944 to July 1960- 1, 450, 000. 00
In response to the final question submitted to us by the Congress as to any further claim, legal or equitable, of *672 plaintiff Jans Froman against tbs United States, as a result of the seaplane crash, we conclude that while this plaintiff has no legal claim, she is entitled under broad and equitable considerations to an additional award of $20,000.00.
In response to the specific questions referred to us by Congress as to plaintiff Gypsy Markoff, we submit the following findings summarized from our more specific findings herein:
Total additional compensation computed under Federal Employees Compensation Act as amended in 1949_ $134, 420.42
Total medical expense_$7, 810. 00
Federal tax savings on above as deductions_
Net medical expense_ 7, 810. 00
Total gifts and recoveries_ 87,180. 00
Gross earnings 1944 to July 1960 (excluding 1951 through 1958 — earnings overseas not reported)_ 45,901.00
In response to the final question submitted by the Congress as to any further claim, legal or equitable, of plaintiff Gypsy Markoff against the United States as a result of the seaplane crash, we conclude that while this plaintiff has no legal claim, she is entitled under broad equitable considerations to an additional award of $20,000.00.
As to the specific questions referred to us by Congress as to plaintiff Jean Fosen, we submit the following findings summarized from our more specific findings herein:
Total additional compensation under Federal Employees Compensation Act as amended in 1949_ $140, 802. 70
Total medical expense_$8, 625. 00
Federal tax savings on above as deductions- 252.24
Net medical expense_ 8, 372. 76
Total gifts and recoveries, including settlement with Pan American Airways for death of her husband_ 46, 715. 00
Gross earnings 1944 to 1951 inclusive — (approx.)_ 54, 000. 00
In response to the final question submitted by the Congress as to any further claim, legal or equitable, of plaintiff Jean Fosen against the United States as a result of the seaplane crash, we conclude that while this plaintiff has no legal claim, she is entitled under broad equitable considerations to an additional award of $20,000.00.
*673 This opinion and findings of fact, together with the conclusions thereon, will be certified by the Clerk to the Committee on the Judiciary of the Senate and to the Committee on the Judiciary of the House of Representatives pursuant to Private Law 8S-713, 85th Congress, approved August 27, 1958, and the letter dated November 12, 1958, from Senator James O. Eastland, Chairman, Committee on Judiciary of the Senate to Chief Judge Marvin Jones of this court in accordance with the Private Law.
It is so ordered.
Laeamoee, Judge; and JoNEs, Chief Judge, concur.

 Senate Report No. 836, August 4, 1949. U.S.C. Congressional Service 81st Cong., 1st sess., 1949, p. 2125.