Bt the Review PaNel: By S. Res. 289, 91st Cong., 1st Sess. (1969), the United States Senate referred S. 2807, a bill for the relief of the Southwest Metropolitan Water and Sanitation District, Colorado, to the Chief Commissioner of *996 the Court of Claims pursuant to 28 U.S.C. §§ 1492 and 2509 (Supp. V, 1965-69). The Chief Commissioner referred the case to Trial Commissioner Mastín G. White for proceedings in accordance with the rules, and designated the above-named members of the Review Panel to consider the trial commissioner’s opinion on the merits of the plaintiff’s legal or equitable entitlement to recover.
After trial on the merits, Commissioner White, in an opinion filed January 29, 1971, concluded that the plaintiff had no legal remedy but did have an equitable claim against the United States, and that there is equitably due the plaintiff from the United States the sum of $246,239.
Both the United States and the plaintiff filed a notice of intention to except to Commissioner White’s opinion, and, on March 15, 1971, the plaintiff timely filed its exception to a portion of the said opinion. On April 15,1971, however, the parties filed a joint motion to withdraw “all appeal documents heretofore filed,” asking that the Review Panel adopt Commissioner White’s opinion and conclusions and submit the same to the Chief Commissioner for transmittal to the United States Senate.
Accordingly, and without oral argument, since the Review Panel unanimously agrees with Commissioner White’s opinion, findings of fact, and conclusions as hereinafter set forth, the Panel adopts the said opinion, findings of fact, and conclusions as the basis for its recommendation that the plaintiff has an equitable claim against the United States, and that there is equitably due the plaintiff from the United States the sum of $246,239.
This determination is hereby submitted to the Chief Commissioner for transmittal to the United States Senate.
OPINION
White, Commissioner:
Pursuant to 28 U.S.C. § 1492, the Senate on December 11, 1969, referred S. 2807, 91st Cong., 1st Sess., to the Chief Commissioner of the Court of Claims.
The legislative proposal in question, S. 2807, was entitled “A bill for the relief of the Southwest Metropolitan Water *997 and Sanitation District, Colorado.” It proposed that the Congress enact legislation authorizing and directing the Secretary of the Treasury to pay to the Southwest Metropolitan Water and Sanitation District “a sum of money, in an amount to be substantiated, representing the amount to which the district is equitably entitled for the cost of designing and constructing certain water and sewer facilities for a planned industrial park located within the district, such facilities no longer being required after a major portion of the land within the industrial park was condemned by the United States for the Chatfield Dam and Reservoir project * *
The reference of S. 2807 to the Chief Commissioiier of the Court of Claims was accomplished by means of S. Res. 239, 91st Cong., 1st Sess. This resolution directed that proceedings be conducted in accordance with 28 U.S.C. § 2509 and that, at the conclusion of such proceedings, the Congress be informed regarding “the nature and character of the demand [of Southwest Metropolitan Water and Sanitation District] as a claim, legal or equitable, against the United States, or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.”
The petition of the Southwest Metropolitan Water and Sanitation District (“the claimant”) was filed with the Clerk of the Court of Claims on March 18,1970; and the answer of the United States (“the respondent”) was filed on May 15, 1970. Thereafter, the case was tried on its merits at Denver, Colorado, on September 14,1970. An extensive stipulation of pertinent facts was entered into by the parties and was made a part of the trial record. The filing by the parties of their post-trial briefs and requested findings of fact was concluded on December 21,1970.
The claimant concedes that it does not have a legal claim against the United States. Therefore, the basic question in the case is whether the claimant has an equitable claim against the United States — i.e., a claim which the United States ought to pay as a matter of moral responsibility (Froman v. United States, 157 Ct. Cl. 661, 669 (1962)).
On the basis of the facts established by the evidence in the record, as summarized in this opinion and set out more fully *998 in the findings of fact, I believe that the claimant has an equitable claim against the United States and that there is equitably due the claimant from the United States the sum of $246,239.
The claimant is a quasi-municipal corporation of the State of Colorado. It was organized on April 25,1961, in accordance with the laws of Colorado. The claimant is authorized to construct, maintain, and operate water and sewer facilities within the geographical boundaries of the claimant’s district; and in performing such functions, the claimant has the power to fix water and sewer tap fees, to levy taxes, and to issue bonds (as well as to do other things that are not pertinent to the present proceeding).
The lands within the claimant’s district, at the time of its organization, included approximately 6,000 acres located in the Counties of Jefferson, Arapahoe, and Douglas, all within the State of Colorado. These lands formed an unincorporated area south and west of Littleton, Colorado, which is a suburban community located approximately 10 miles south of Denver, Colorado. The area was regarded as being suitable principally for residential development. Only a very small portion of the area originally within the claimant’s district was regarded as having an industrial potential.
The “industrial park” referred to in S. 2807 is commonly known as the Blakeland Industrial Park. It was not part of the claimant’s district ]at the time when the claimant was organized in 1961.
In 1959, approximately 2 years prior to the organization of the claimant, the Rio Grande Land Company (a subsidiary of the Denver & Rio Grande Western Railroad) assembled a 475-aore parcel of land in Jefferson and Douglas Counties, Colorado, to be developed as an industrial site. The site was given the name of Blakeland Industrial Park; and lots within it were to be platted for resale to the public.
The Blakeland Industrial park was located on the east bank of the South Platte River, at a point below the junction where Plum Creek enters the South Platte River. The South Platte River flows north from this point through the cities of Littleton, Englewood, and Denver up to Greeley, Colo *999 rado, where it turns east to join the North Platte River in Nebraska. The two rivers then form the Platte River, which ultimately flows into the Missouri River.
In order to utilize the Blakeland Industrial Park as an industrial site, it was necessary to have water and sewer facilities available. The Rio Grande Land Company first approached the city government of Littleton and requested that it provide water and sewer services to the Blakeland Industrial Park. However, the municipal authorities referred the Rio Grande Land Company to the claimant (which had been organized by that time) for the provision of the desired services. The claimant was willing to provide water and sewer services to the Blakeland Industrial Park; and as a result of negotiations between the Rio Grande Land Company and the claimant, the Blakeland Industrial 'Park became part of the claimant’s district and the claimant’s original plans for the development of the district were changed so as to provide for water and sewer services to be furnished by the claimant to the Blakeland Industrial Park. The claimant redesigned its proposed water and sewer facilities in order to provide the contemplated services to the Blakeland Industrial Park.
The Rio Grande Land Company spent between $800,000 and $1,000,000 in developing and grading sites within the Blakeland Industrial Park for sale. Two sales of industrial sites were made — one of 36.6 acres to the International Pipe and Ceramics Corporation in 1963 and another of 9.75 acres to the United States Rubber Company in 1.964.
In order to finance the construction of water and sewer facilities to serve property owners within its district, including property owners in the Blakeland Industrial Park, the claimant in November 1961 issued and sold to the public 5-percent bonds in the principal amount of $1,460,000. The circular which advertised the bonds for sale stressed primarily the fact that the Blakeland Industrial Park was to be developed within the district, inasmuch as the industrial properties would be able to carry the highest potential assessment for tax purposes. The circular estimated that when the development of the Blakeland Industrial Park was completed, the valuation for tax purposes of the properties *1000 within the industrial park would 'be approximately $21,000,000.
The claimant and the purchasers of its 'bonds relied primarily on the tax potential of the Blakeland Industrial Park as providing assurance that the claimant would be able to pay off its bonded indebtedness. In this connection, it was anticipated that, by virtue of the high valuation of the properties within the Blakeland Industrial Park, the claimant would be able to operate successfully and pay off its bonded indebtedness on the basis of a tax rate of approximately 10 mills. This was an important factor, because it is generally considered that the tax rate for water and sewer services should not exceed a maximum figure of 10 mills. For example, the FHA and the Veterans Administration will not approve loans on properties within special service districts (such as the claimant’s district) where the tax rate for water and sewer services is in excess of 10 mills. Thus, the imposition by a district of a rate higher than 10 mills has the effect of inhibiting the development of lands within the district for residential or industrial purposes, as well as imposing a heavy burden on property owners within the district (the average tax rate, by districts similar to the claimant, for water and sewer services ranges between 4 mills and 8 mills).
After the claimant’s bonds were sold, the claimant constructed water and sewer lines to serve property owners within its district, including water and sewer lines along the South Platte River from Littleton down to Blakeland Industrial Park to serve that area. The construction was completed in December of 1962.
Although S. 2807 referred to both “water and sewer facilities for a planned industrial park * * * [as] no longer being required after a major portion of the land within the industrial park was condemned by the United States,” it is only the sewer line which the claimant constructed from Littleton to the Blakeland Industrial Park that is actually involved in this proceeding. The water line that was constructed along that route has been relocated at no cost to the claimant, and the claimant does not assert any claim with respect to such water line.
*1001 Tu connection with, the construction of the sewer line from Littleton to the Blakeland Industrial Park, the claimant applied for and received from the U.S. Department of Health, Education, and Welfare the sum of $243,304 as a grant-in-aid. The net cost to the claimant of constructing the sewer line amounted to $575,908.71.
The condemnation by the United States of most of the lands within the Blakeland Industrial Park was occasioned by a severe flood which occurred in 1965 as the result of heavy rainfall on the watersheds of Plum Creek and the South Platte River. Even before 1965, the South Platte River was subject to occasional flooding. In 1933 and 1942, the river flooded, causing extensive property damage in the city of Denver. Accordingly, plans were undertaken as early as 1942 to protect Denver from future floods on the South Platte River. In the Rivers and Harbors Act of 1950 (64 Stat. 163, 175), Congress authorized the construction by the Army Engineers of a dam, to be known as the Chatfield Dam, on the South Platte River immediately downstream from the point where Plum Creek flows into the river. However, no funds were appropriated by Congress for the construction of the dam in 1950 or during a 16-year period thereafter. The plans for the construction of the Chatfield Dam and Reservoir project were referred to in the Army Engineers’ annual reports as being in an active status from 1950 to 1956; but thereafter, until 1965, such plans were carried in the annual reports of the Army Engineers as being in an inactive status.
The 1965 flood, previously mentioned, was the most devastating flood in the recorded history of the South Platte River. It inundated the area within the Blakeland Industrial Park, except for the properties of the International Pipe and Ceramics Corporation and of the United States Rubber Company, which were located in the higher portion of the industrial park; and it caused millions of dollars worth of damage in the portions of Denver and its suburbs lying within the flood plain of the South Platte River.
Following the 1965 flood, Congress appropriated funds in 1966 for the construction of the Chatfield Dam and Reservoir project; and construction of the project was started in 1967.
*1002 After funds were appropriated for the construction of the Chatfield Dam and Reservoir project, a proceeding to condemn lands needed for the project was instituted by the United States in the U.S. District Court for the District of Colorado. The condemnation suit involved, and resulted in the taking by the United States of, a major portion of the Blakeland Industrial Park (420 acres out of a total acreage of 475) and 655 additional acres of land located within the claimant’s district.
The taking by the United States of most of the lands within the Blakeland Industrial Park had the following adverse consequences insofar as the claimant was concerned:
(1) It resulted in the removal of such lands from the public tax rolls.
(2) It deprived the claimant of the major tax source upon which the claimant relied in planning and constructing the sewer line from Littleton to the Blakeland Industrial Park.
(3) It deprived the claimant of most of the potential users that the claimant expected to serve when it planned and constructed the sewer line in question.
(4) It depleted the collateral supporting the claimant’s bonds.
(5) It resulted in the market value of the claimant’s bonds being reduced approximately 40 percent to 60 percent below their face value.
(6) It impaired the claimant’s ability to pay its bonds on time.
(7) It necessitated an exceedingly high tax rate on those lands within the claimant’s district that still remain on the public tax rolls.
With respect to point (7) mentioned in the preceding paragraph, the claimant’s tax assessment is determined after the annual cost of operating the claimant’s district is fixed (and such cost includes the bond requirements for both principal and interest). The amount of the expected revenues from sources other than taxes (principally tap fees charged for making water and sewer connections with new structures) is deducted from the total operating cost; and the remainder, *1003 which, represents the net operating cost, is divided by the valuation of the properties within the district that are on the public tax rolls. This produces a tax rate in mills to be charged each taxpayer on the valuation of any property that is on the tax rolls. Subsequent to the removal of the Blakeland Industrial Park lands from the tax rolls as the result of such lands being condemned by the United States for the Chatfield Dam and Beservoir project, the tax rate within the claimant’s district has gone up markedly, to where it was 34.5 mills in 1969,32.5 mills being assigned to the payment of bond principal and interest. The tax rate was expected to be 37 mills in 1970; and the rate by 1982 may reasonably be expected to reach a figure somewhere within the range of 250 to 297 mills.
Even the claimant’s present tax rate imposes a hardship on property owners within the claimant’s district. Furthermore, (the development of properties within the district is being substantially inhibited by the high tax rate, since it is difficult, if not impossible, to secure financing on any property bearing such a high tax rate for water and sewer services. Unless the claimant is able to obtain relief in some way, the situation will be virtually intolerable by 1982, since the tax rate at that time will be 250 mills or more, and a 10-mill figure is regarded as being the maximum rate that a district such as the claimant can feasibly impose.
If the claimant’s tax rate could be reduced to 10 mills, it is reasonable to conclude that the development of the residential areas within the district would be stimulated, and soon the increased valuation of such lands on the tax rolls would provide a sufficient tax 'base to permit the claimant to recover its financial position.
Since the United States is responsible for the claimant’s unfortunate situation, it is my opinion that the United States is under a moral obligation to provide some relief to the claimant. If the United States had not taken most of the lands within the Blakeland Industrial Park, it is reasonable to infer that the industrial park would have been fully developed within a 25-year period; that such properties would *1004 have had a valuation for tax purposes of approximately $21,000,000; and that such valuation would have been sufficient to permit the claimant to operate successfully and to pay off its bonded indebtedness on the basis of a tax rate which would not have exceeded 10 mills. In this connection, it is true that the lands within the Blakeland Industrial Park that were taken by the United States had been flooded in 1965. However, the evidence in the record warrants the inference that the development of the lands within the Blakeland Industrial Park would not have been prevented by the possibility of a subsequent flood, if the Ohatfield Dam and Beservoir project had not been constructed by the United States.
As indicated in finding 33, the parties are in agreement that there are four alternative methods that can be used in evaluating the effect on the claimant of the taking by the United States of lands within the claimant’s district for the Chatfield Dam and Beservoir project, and the removal of such lands from the public tax rolls. It is my view that the second method is the preferable one, since it is concerned with the taking of industrial lands only- — which is the crucial issue in this proceeding — and it takes into account an annual income which the claimant can obtain from the city of Littleton in connection with the use of the sewer line that runs between Littleton and the Blakeland Industrial Park to serve an industrial plant that is located outside the claimant’s district.
Under the second method, it is estimated that, in the absence of the taking by the United States of lands within the Blakeland Industrial Park, the claimant’s district would have included a total of 525 acres that could have been developed for industrial purposes; that such development would have been accomplished within a 25-year period; that the claimant’s total income from such industrial lands during the 25-year period, in the form of taxes and tap fees, would have amounted to $1,559,480; and that the present discounted worth of such income would be $642,443. It is further estimated that after the taking by the United States, only 14 percent of the lands within the claimant’s district having an industrial potential remain on the public tax rolls; that the present discounted worth of the claimant’s anticipated income *1005 from such remaining industrial lands during tbe 25-year .development period is $89,942; that the discounted worth of the claimant’s income from the industrial lands within its district has thus been reduced from $642,443 to $89,942, or by the net amount of $552,501, as the result of the taking by the United States; and that 60 percent of such reduction, or $331,500, should be allocated to the sewer facilities. When the anticipated income of $15,000 per year to the claimant from the city of Littleton for a sewer connection to serve the property of the Gates Rubber Company (located outside the claimant’s district) is taken into account, with an adjustment because of the cost to the claimant of providing an additional sewer line extension, the $331,500 should be reduced by a net amount of $85,261, thus leaving a remainder of $246,239 as representing the estimated damages to the claimant.
According to this method, therefore, the damages to the claimant arising from the taking by the United States of industrial lands within the claimant’s district amount to $246,239. Consequently, I believe that this is the amount which is equitably due from the United States to the claimant.
FINDINGS oe Fact
1. (a) Pursuant to S. Res. 239,91st Cong., 1st Sess., S. 2807 was referred to the Chief Commissioner of the United States Court of Claims.
(b) The text of S. Res. 239 is as follows:
Resolved, That the bill (S. 2807) entitled “A bill for the relief of the Southwest Metropolitan Water and Sanitation District, Colorado”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Chief Commissioner of the United States Court of Claims; and the Chief C ommissioner of the United States Court of Claims shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States, or a gratuity, and the *1006 amount, if any, legally or equitably due from the United States to the claimant.
2. (a) S. 2807, 01st Cong., 1st Sess., is entitled “A bill for the relief of the Southwest Metropolitan Water and Sanitation District, Colorado.”
(b) The text of S. 2807 is as follows:
Be it enacted by the Senate and House of Representatives of the United States of America im, Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the Southwest Metropolitan Water and Sanitation District, Colorado, a sum of money, in an amount to be substantiated, representing the amount to which the district is equitably entitled for the cost of designing and constructing certain water and sewer facilities for a planned industrial park located within the district, such facilities no longer being required after a major portion of the land within the industrial park was condemned by the United States for the Chatfield Dam and Reservoir project, and by reason of the inundation of, or other adverse effects upon, certain other facilities and properties located within such district in connection with the said Chat-field Dam project.
Sec. 2. No part of the amount appropriated in this Act in excess of 20 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
3. (a) On December 29, 1969, the Clerk of the United States Court of Claims served a “Notice of Docketing” in Congressional Reference Case No. 5-69 upon the claimant and the respondent, and of the filing of S. 2807, S. Res. 239, and accompanyingpapers.
(b) The claimant’s petition was filed with the Clerk of the United States Court of Claims on March 18, 1970.
(c) The respondent’s answer was filed with the Clerk of the United States Court of Claims on May 15,1970.
*1007 (d) A' “Stipulation of Uncontroverted Pertinent Facts” was filed with the Clerk of the United States 'Court of Claims by counsel for the claimant and for the respondent, and was admitted into evidence on September 14, 1970.
(e) The case was tried on its merits at Denver, Colorado, on September 14,1970.
(f) The filing by the parties of their post-trial briefs and requested findings of fact was concluded December 21,1970.
4. (a) The Southwest Metropolitan Water and Sanitation District (“the claimant”) is a quasi-municipal corporation of the State of Colorado, having been organized pursuant to a decree of the District Court, First Judicial District, State of Colorado, in Case No. 15486 on April 25,1961, in accordance with Colorado Eevised Statutes, 1968, 89-5 et seq., as amended.
(b) The claimant, pursuant to Colorado laws, may sue, be sued, enter into contracts, and construct, build, maintain, and operate water and sewer systems and appurtenances. It has the power to exercise rights of eminent domain, fix water and sewer tap fees and rates, borrow money, issue and reissue bonds, conduct elections, and levy taxes, all in accordance with the pertinent statutes of the State of Colorado.
5. (a) The lands within the claimant’s district, at the time of its organization, included approximately 6,000 acres located in the Counties of Jefferson, Arapahoe, and Douglas, all within the State of Colorado. These lands formed an unincorporated area south and west of Littleton, Colorado, which is a suburban community located approximately 10 miles south of Denver, 'Colorado.
(b) The lands referred to in paragraph (a) of this finding do not consist entirely of contiguous tracts. Generally speaking, the lands within the claimant’s district which are located in the central part of Jefferson County may be considered suitable for residential development primarily, the lands within the district which are located in Douglas County border on the South Platte Eiver and relate primarily to the Blakeland Industrial Park area (see finding 8), and the lands within the district which are located in Arapahoe *1008 County are primarily located along the banks of the South Platte River downstream from the location of Chatfield Dam (see finding 24).
6. It was the claimant’s original plan to serve a residential area located in the central section of Jeiferson County and west of the South Platte River, in Sections 22,23, and 28, Township 5 South, Range 69 West, Jefferson County, Colorado, with later development to include the lands just north of the South Platte River.
7. Areas outside the corporate limits of cities in Colorado counties are unable to provide services such as fire, water, sewer, and recreation. Services of the sort mentioned are supplied through special service districts.
8. (a) In 1959, the Rio G-rande Land Company, a subsidiary of the Denver & Rio Grande Western Railroad, assembled a 475-acre parcel of land in Jefferson and Douglas Counties, Colorado, to be developed as an industrial site. The site was given the name of Blakeland Industrial Park, and lots within it were to be platted for resale to the public.
(b) The Blakeland Industrial Park is located on the east bank of the South Platte River, at a point below the junction where Plum Creek enters the South Platte River. The South Platte River flows north from this point through the cities of Littleton, Englewood, and Denver up to Greeley, Colorado, where it turns east to join the North Platte River in Nebraska. The two rivers then form the Platte River, which ultimately flows into the Missouri River.
(c) In order to utilize the Blakeland Industrial Park, as an industrial site, it was necessary to 'have water and sewer facilities available. The Rio Grande Land Company first approached the city of Littleton and requested that it provide water and sewer services to the Blakeland Industrial Park, but Littleton referred the Rio Grande Land Company to the claimant for the provision of the desired services.
(d) The claimant was willing to provide water and sewer services to the Blakeland Industrial Park. Accordingly, as the result of negotiations, the land within the Blakeland Industrial Park became part of the claimant’s district; and the claimant’s original plans for the development of the dis *1009 trict were changed so as to provide for water and sewer services to 'be furnished by the claimant to the Blakeland Industrial Park. The claimant redesigned its proposed water and sewer facilities in order to provide the contemplated services to the Blakeland Industrial Park.
9. (a) The Rio Grande Land Company spent between $800,000 and $1,000,000 in developing and grading sites within the Blakeland Industrial Park for sale.
(b) Two sales of industrial sites in the Blakeland Industrial Park were made, *.<?., 36.6 acres to the International Pipe and Ceramics Corporation in 1963 and 9.75 acres to the United States Rubber Company in 1964.
10. The claimant relied upon the tax potential of the Blake-land Industrial Park (1) in redesigning its facilities in order to serve the Blakeland Industrial Park, (2) in establishing the feasibility of the claimant’s bonds with respect to sale and repayment, and (3) in ultimately constructing the system.
11. (a) The claimant approached Boettcher and Company to determine if financing could be arranged to secure the necessary funds with which to construct the sewer and water facilities, as planned. Income out of which to pay the interest and debt charges would come from tax assessments and from charges for water and sewer taps.
(b) Boettcher and Company employed Blaine B. Chase to make an appraisal of the property included within the claimant’s district to determine if a bond issue would be feasible.
12. Feasibility studies conducted by the claimant, Boettcher and Company, United States Fidelity and Guaranty Company, Connecticut General Life Insurance Company, and Blaine B. Chase attributed a multimillion-dollar tax base to Blakeland Industrial Park, such tax base being of sufficient amount to justify a $1,460,000 bond sale.
13. (a) Based on Blaine B. Chase’s appraisal made in 1961 (see finding 11), Boettcher and Company published an offering circular which advertised the sale of a bond issue in the amount of $1,460,000 by the claimant to finance the construction of sewer and water lines to serve property owners within the claimant’s district. The report primarily stressed the fact that the Blakeland Industrial Park was to be developed *1010 within the district, since the industrial property would be able to carry the highest potential tax assessment, thus assuring the ability of the claimant to pay off its bonded indebtedness.
(b) The offering circular pointed out that the Bio Grande Land Company had spent $860,000 in site development, exclusive of railroad spurs; and estimated that when the Blake-land Industrial Park was completed, the valuation for tax purposes would be approximately $21,000,000.
(c) The potential development of residential properties within the claimant’s district was discussed in the offering circular, and the fact that there was a potential growth was mentioned, but no specific estimate of future valuation was given.
14. Blaine B. Chase, in making his appraisal (see finding 11), estimated that with the availability of sewer and water services, the residential potential in the claimant’s district would increase markedly. He estimated that the average homes to be constructed in the area would be evaluated at $25,000 each; that there would be a density of approximately two homesites per acre; and that there would be approximately 250 new housing construction starts per year in the residential area of the claimant’s district, extending over a 85-year period.
15. (a) The claimant issued and sold General Obligation Water and Sewer Bonds having a face value of $1,460,000, and a 5 percent interest rate, under the date of November 1, 1961, to finance the construction of water and sewer facilities.
(b) The claimant’s charter authorized a bond issue of $2,300,000.
(c) The bonds having a face value of $1,460,000, mentioned in paragraph (a) of this finding, were sold to the United States Fidelity and Guaranty Company, Connecticut General Insurance Company, and Monarch Life, all of them being industrial investors. United States Fidelity and Guaranty Company bought $750,000 worth of the issue; Connecticut General Insurance Company bought $585,000 worth of the *1011 issue; and Monarch Life bought the remainder of the issue.
(d) The investing companies relied on the development of the Blakeland Industrial Park as a strong assurance that there was sufficient potential income to pay off the debt.
(e) The bonds are exempt from federal income taxes.
(f) The bonds are not a lien on the lands within the claimant’s district. Each current year’s obligation is provided for as a tax assessment, and the tax assessment for the current year only becomes a lien.
16. (a) Generally, special service districts with the power to levy taxes, such as the claimant in this case, do not issue bonds which are a lien on the land.
(b) In a special service district, part of the annual assessment is for service rendered during the year. On the other hand, special assessment districts, such as districts constructing streets and sidewalks, with the power to levy assessments but without the power to tax, issue bonds which are a lien on the land. In such a case, the owner of land adjoining the street or sidewalk can pay off the full assessment against his land.
17. The claimant and the purchasers of the claimant’s bonds relied upon the tax potential of the lands within the Blakeland Industrial Park areas in determining the economic feasibility of the claimant’s project and the claimant’s ability to repay the indebtedness. Such reliance influenced the purchasers’ decisions to acquire the claimant’s bonds.
18. The bonds referred to in finding 15 were refunded by the claimant into an outstanding issue of General Obligation Water and Sewer Refunding Bonds under the date of November 1,1965, in a principal amount of $1,440,000.
19. (a) After the bonds mentioned in previous findings were sold, the claimant constructed sewer and water lines to serve part of the central area of Jefferson County, Colorado; and the claimant constructed sewer and water lines along the South Platte River from Littleton down to the Blakeland Industrial Park to serve that area.
(b) Only the sewer line from Littleton to the Blakeland Industrial Park is involved in the present proceeding. The related water line along that route was later relocated at *1012 no cost to the claimant; and the claimant does not assert any claim with respect to such water line.
20. (a) The claimant constructed a sanitary sewer outfall line, generally adjacent to the South Platte Diver, from the Littleton Sewage Treatment Plant to the Blakeland Industrial Park, a distance of 28,346 lineal feet, in anticipation and reliance upon the fact that the projected development of the Blakeland Industrial Park would supply major users of the claimant’s water and sewer facilities, together with an adequate tax base to enable the claimant timely to retire its bonded indebtedness incurred in the construction of water and sewer facilities upon normal mill levies.
(b) The sanitary sewer line was sized at 48 to 33 inches in diameter.
(c) The sewer line constructed by the claimant to the Blakeland Industrial Park was designed to be used by other areas in the claimant’s district as a major outfall collection line.
(d) The construction was completed in December of 1962.
21. (a) The claimant applied for and received from the United States Department of Health, Education, and Welfare the sum of $243,304 as a grant-in-aid bo assist in the cost of constructing the sanitary sewer outfall line extending from the Littleton Sewage Treatment Plant to the Blakeland Industrial Park.
(b) The costs of construction were as follows:
Contract construction costs_$767,163. 92
Engineering costs_ 42,174. 71
Administration and legal costs_ 8,164. 60
Less sales tax refund_ (6,490.22)
811, 013. 01
Less Federal participation_ 243, 304. 00
567,709. 01 ~
Add easement costs_ 8,199.70
Total construction costs to claimant_ 575,908.71
(c) The sewer line constructed by the claimant from the Littleton Sewage Treatment Plant to the Blakeland Indus *1013 trial Park cost the claimant a net sum of $575,908.71.
22. There was no intermediate user between the Littleton Sewage Treatment Plant and the Blakeland Industrial Park at the time of the construction of the outfall sewer line to serve the Blakeland Industrial Park. The sewer line was constructed primarily for the Blakeland Industrial Park.
23. (’a) Interest paid up to September 14, 1970, by the claimant on the $575,908.71 referred to in finding 21(c) amounted to $205,200.
(b) Interest to be paid by the claimant subsequent to September 14,1970, and during the term of the bonds mentioned in findings 15 and 18, will amount to $518,400.
24. The South Platte Liver is subject to occasional flooding. In 1933 and 1942, the river flooded, causing extensive damage to property in the city of Denver. Accordingly, plans were undertaken as early as 1942 to protect Denver from future floods on the South Platte. House Document 669, 80th Cong., 2d Sess., was prepared in 1948 as a feasibility report, proposing the construction of a dam, to be known as the Chat-field Dam, immediately downstream from the point where Plum Creek flows into the South Platte Liver. This feasibility report was approved and construction of the Chatfield Dam was authorized by Congress in the Livers and Harbors Act of 1950 (64 Stat. 163, 175), but no funds were made available for the construction of the dam. The plans for the construction of the Chatfield Dam were referred to in the Corps of Engineers’ annual reports as being in an active status from 1950 to 1956. Thereafter, until 1965, the construction of the Chatfield Dam was carried in the Corps of Engineers’ annual reports as being in an inactive status.
25. (a) In 1965, there was a severe flood resulting from heavy rainfall in the Plum Creek and South Platte Liver watersheds. This was the most devastating flood in the recorded history of the South Platte Liver. It inundated the lands within the Blakeland Industrial Park, except for the properties of the International Pipe and Ceramics Corporation and of the United States Lubber Company (see finding 9(b)), which were located in the higher area of the Blakeland Industrial Park. The 1965 flood caused millions of dollars *1014 worth of damage to the portions of Denver and its suburbs lying within the flood plain of the South Platte Eiver.
(b)The areas adjacent to the South Platte Eiver that sustained flood damage in 1965 were not abandoned, but were subsequently rebuilt.
26. (a) After the flood of 1965, Congress appropriated funds for the construction of the Chatfield Dam and Eeser-voir project.
(b) Hearings on the matter of an appropriation for the Chatfield Dam and Eeservoir project were held by the Subcommittee on Public Works of the Committee on Appropriations, United States Senate, in April of 1966. The claimant informed that subcommittee of the claimant’s possible loss and damage if the project was constructed at the location then under consideration.
(c) The claimant, in its presentation to the subcommittee, recognized the damage suffered by property owners in the community as a result of the flooding, and endorsed construction of the Chatfield Dam and Eeservoir project, but asked that an appropriation be made to relieve the claimant “from unusual burdens and economic stress,” since the claimant had. invested a large sum of money in facilities to serve the Blake-land 'Industrial Park area and would lose the tax base and anticipated tax income from such area if the project was constructed at the proposed site. Congress did not take any action for the relief of the claimant.
(d) The Chatfield Dam and Eeservoir project was funded in 1966, and construction was started in 1967.
27. (a) After funds were appropriated for the construction of the Chatfield Dam and Eeservoir project, a condemnation proceeding entitled United States v. 425.69 Acres, More, or Less, in Douglas and Jefferson Counties, State of Colorado, and Rio Grande Land Co., et al., Civil No. 67-C-346, was filed in the United States District Court for the District of Colorado. The condemnation suit involved a major portion of the Blakeland Industrial Park (420 acres out of a total acreage of 475) and 655 additional acres of land located within the claimant’s district.
*1015 (b) Title to the lands ref erred to in paragraph, (a) of this finding was acquired by the United States subject to “existing easements for public roads and highways, public utilities, railroads, and pipelines.”
(c) The claimant petitioned to be made a party to the condemnation proceeding mentioned in paragraph (a) of this finding, so that the claimant could participate in the award. The claimant’s motion was opposed by the Rio Grande Land Company. By an order dated June 23,1969, the District Court denied the claimant’s 'application to be joined as a party, since the lands were acquired by the United States subject to easements for public utilities and pipelines, and the claimant could establish no other ownership of land in the area. The District Court observed that the taking of lands in the Blake-land Industrial Park would reduce the tax base of the lands within the claimant’s district and would reduce the number of potential water and sewer taps within the district, thus causing the remaining lands in the district to carry a greater tax burden, but said that such results were not considered compensable as a matter of law.
28. The taking by the United States of most of the lands within the Blakeland Industrial Park had the following adverse consequences insofar as the claimant .was concerned:
(a) It resulted in the removal of such lands from the public tax rolls.
(b) It deprived the claimant of the major tax source upon which the claimant relied in planning and constructing the outfall sewer line from the Littleton Sewage Treatment Plant' to the Blakeland Industrial Park.
(c) It deprived the claimant of most of the potential users that the claimant expected to serve when it planned and constructed the sewer line mentioned in paragraph (b) of this finding.
(d) It depleted the collateral supporting the claimant’s bonds.
(e) It resulted in the market value of the claimant’s bonds being reduced approximately 40% to 60% below their face value.
*1016 (f) It impaired the claimant’s ability to pay its bonds on time.
(g) It necessitated an exceedingly high, tax rate on those lands within the claimant’s district that still remain on the public tax rolls (see 'findings 29 and 30).
29. (a) The claimant secures its revenue from two sources. One is the fee charged for making water and sewer connections with new structures, called a tap fee. The other source is a tax assessment. The tax assessment is determined after the annual cost of operating the claimant’s district is fixed, which includes the bond requirements for both principal and interest, less the amount of the expected revenues from sources other than taxes, and dividing the net operating cost figure by the valuation of the properties within the district. This produces a mill rate to be charged each taxpayer on the valuation of property on the tax rolls.
(b) It is usually considered that the mill rate for water and sewer services should be no more than 10 mills. The FHA and the Veterans Administration refuse to approve loans for federal purposes within districts where the mill rate for water and sewer services is in excess of 10 mills.
30. (a) The development of the properties within the claimant’s district is being markedly inhibited by the high mill rate. It is difficult, if not impossible, to secure financing on property bearing such a high tax rate, and the property owners protest the burden.
(b) If the claimant’s mill rate could be reduced to 10 mills, it is reasonable to conclude that the development of the residential areas within the district would be stimulated, and soon the increased assessed value on the tax rolls would supply a sufficient tax base to retain a low mill rate assessment, and the claimant would recover its financial position.
(c) It was anticipated at the time when the offering circular which advertised the claimant’s bonds for sale was published (see finding 13) that the mill rate would be approximately 10 mills. After the Blakeland Industrial Park lands -were removed from the tax rolls, the mill rate within the claimant’s district has gone up markedly, to where it was 34.5 mills in 1969, 32.5 mills being assigned to bond and interest *1017 payments; and it was expected to be 37 mills in 1970. Because the retirement of $1,425,000 worth of the claimant’s bond issue is reserved until 1982-85, the mill rate in 1982 may reasonably be expected to reach 250 to 297 mills.
(d) The present high mill levy of the claimant to pay bonds and interest is a hardship on homeowners within the claimant’s district.
31. The average water and sewer mill levy of districts similar to the claimant is 4 to 8 mills.
32. An industrial area is being developed in Section 33, north of the location of the Ohatfield Dam and near the South Platte River. It is referred to as the Gates Rubber Company property. The property lies immediately east of the boundary line of the claimant’s district, in Arapahoe County. It is essential for Gates Rubber Company to receive sewer service. The company is not willing to be included within the claimant’s district because of the high mill rate. The city of Littleton, in order to serve the Gates property, has offered to pay the claimant $15,000 a year for the privilege of connecting its service line from the Gates property to the claimant’s sewer line that was placed along the bank of the South Platte River to serve the Blakeland Industrial Park.
33. (a) Blaine B. Chase (see findings 11-14) was engaged by both the claimant and the United States to make an evaluation of the effect that the taking of lands within the claimant’s district for the Chatfield Dam and Reservoir project, and the removal of such lands from the public tax rolls, will have on the claimant. Mr. Chase, acting for both parties, used four alternative methods or approaches in making such evaluation; and the results indicated in the succeeding paragraphs of this finding were reached when the respective methods were applied.
(b) Under the first method, it was estimated that, in the absence of the taking of lands within the claimant’s district by the United States, the total area would have been fully developed for residential and industrial purposes within a 35-year period; that during such period the claimant’s tax income from the lands within its district would have totaled *1018 $8,596,558; that $5,157,935 of this total tax income would have been attributable to the sewer facilities; that the ultimate tax income of $5,157,935 from the sewer facilities would have a present discounted worth of $1,654,318; and that the ratio between the cost of the sewer facilities and the tax income from such facilities would be 1:3.6. It was then estimated that, with the elimination from the tax rolls of the lands within the claimant’s district that were taken by the United States, the claimant’s total tax income during the 35-year period would amount to $5,570,970; that the portion of such tax income attributable to the sewer facilities would be $3,342,582; that the present discounted worth of the ultimate tax income attributable to the sewer facilities would be $1,015,385; and that the ratio between the cost of the sewer facilities and the tax income attributable to such facilities would be 1:2.28. The difference between the “before” tax income of $1,654,318 and the “after” tax income of $1,015,385 would represent estimated damages in the amount of $638,933. Also, the difference between the “before” cost-income ratio of 1:3.6 and the “after” cost-income ratio of 1:2.28 would represent a 37% reduction in the cost-income ratio; and if this percentage were applied to the $1,440,000 representing the principal amount of the claimant’s bonds that are outstanding (see finding 18), the result would be estimated damages in the amount of $532,800. However, if the anticipated income to the claimant from the city of Littleton for a sewer connection to serve the property of the Gates Rubber Company (see finding 32) is taken into account, with an adjustment because of the cost to the claimant of providing an additional sewer line extension, the respective damage figures of $638,933 and $532,800 should each be reduced by a net amount of $85,261 to $553,672 and $447,539 under the first method of computation.
(c) Under the second method, it was estimated that, in the absence of the taking by the United States of lands within the Blakeland Industrial Park, the claimant’s district would have included 525 acres that could have been developed for industrial purposes; that such development would have been *1019 accomplished within a 25-year period; that the claimant’s total income from such industrial lands during the 25-year period, in the form of taxes and tap fees, would have amounted to $1,559,480; and that the present discounted worth of such income would be $642,443. It was further estimated that after the taking by the United States, only 14% of the lands within the claimant’s district having an industrial potential remain on the public tax rolls; that the discounted worth of the anticipated income from such remaining industrial lands during the 25-year development period would amount to $89,942; that the discounted worth of the claimant’s income from the industrial lands within its district would thus be reduced from $642,443 to $89,942, or by the net amount of $552,501, as the result of the taking by the United States; and that 60% of such reduction, or $331,500, should be allocated to the sewer facilities. When the anticipated income to the claimant from the city of Littleton for a sewer connection to serve the property of the Gates Lubber Company is taken into account, with an adjustment because of the cost to the claimant of providing an additional sewer line extension, the $331,500 should be reduced by a net amount of $85,261, thus leaving a remainder of $246,239 as representing the estimated damages to the claimant under the second method of computation.
(d) Under the third method, the prices paid during recent years for lands situated within the claimant’s' district were compared with prices paid for comparable lands in the same general area but outside the district boundaries. It was concluded that lands within the claimant’s district have a market value approximately 40% less than comparable lands situated outside the district boundaries, and that this difference is attributable to the high mill tax levy forced upon the claimant as a result of the acquisition of lands within the claimant’s district by the United States for the Ohatfield Dam and Reservoir project. When this percentage factor is applied to the $1,440,000 representing the principal amount of the claimant’s outstanding bonded indebtedness, the result *1020 is a figure of $576,000 representing the claimant’s damages under the third method.
(e) Under the fourth method, the present market value of the claimant’s outstanding bonds was estimated, and it was concluded that such bonds could be sold in the open market to knowledgeable buyers at a price somewhere between 40% and 60% of their face amount. Therefore, since the claimant’s outstanding bonds have a total face value of $1,440,000, the claimant’s damages, consisting of the loss in valuation sustained by the claimant’s bonds, would range between a minimum of $576,000 and a maximum of $864,000 under the fourth method.
34. At the trial of this case, representatives of the claimant testified that in the event the Congress should make an award to the claimant, the funds would not be used to pay off the principal of the bonded indebtedness, but would be invested in a fund to be used over a period of time to pay the claimant’s current bond and interest obligations only, in an effort to reduce the mill levy to 10 mills, with the hope that new interest could be stimulated in the development of the residential areas within the claimant’s district, and that there would be a sufficient development of the residential areas to increase the assessed valuation of such areas to the point where a 10-mill levy on the residential areas would enable the claimant to pay its obligations.
CONCLUSIONS
1. The claimant does not have any legal remedy with respect to the adverse consequences resulting from the action of the United States in taking lands within the claimant’s district for the Ohatfield Dam and Eeservoir project.
2. The claim asserted by the claimant in the present proceeding is not legal in its nature or character.
3. The claimant has an equitable claim against the United States, and there is equitably due the claimant from the United States the sum of $246,239.