**Elizabeth Lilly SCHRAGER–SINGER, Petitioner,**

v.

**ATTORNEY GENERAL OF UNITED STATES, Respondent.**

**No. 15046.**

United States Court of Appeals District of Columbia Circuit.

Submitted Sept. 23, 1959.

Decided Nov. 5, 1959.

Mr. Joel D. Wolfsohn, Washington, D. C., submitted on the pleadings for petitioner.

Mr. Irwin A. Seibel, and Miss Marbeth A. Miller, Attys., Dept. of Justice, submitted on the pleadings for respondent.

Mr. Irving Jaffe, Atty., Dept. of Justice, also entered an appearance for respondent.

Before WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

On July 17, 1931, the petitioner, Mrs. Elizabeth Lilly Schrager-Singer, then a citizen and resident of Rumania, deposited the sum of $2,041.46 in dollars in the Hungarian Discount and Exchange Bank of Budapest, for which the bank issued to her two passbooks showing deposits aggregating that amount. For such dollar deposits, the Hungarian bank maintained a "cover account" in the New York Agency of the Swiss Bank Corporation. After the transaction with Mrs. Schrager-Singer, it added to its New York account a sum equal to the amount deposited with it by her.

Section 202(a) of the International Claims Settlement Act of 1949, as amended, 22 U.S.C.A. § 1631a(a), 69 Stat. 562, provides that in accordance with the Treaties of Peace with Bulgaria, Hungary and Rumania

" * * * any property which was blocked in accordance with Executive Order 8389 of April 10, 1940, as amended, and remains blocked on the effective date of this title [August 9, 1955], and which, as of September 15, 1947, was owned directly or indirectly by Bulgaria, Hungary, and Rumania or by any national thereof as defined in such Executive order, shall vest in such officer or agency as the President may from time to time designate * * * ." 1

On March 21, 1959, the Director of the Office of Alien Property 2 found and determined that the Hungarian bank was a national of Hungary as defined in Executive Order 8389, as amended, and that it was then and had been on September 15, 1947, the direct or indirect owner of a blocked account of $12,531.25 which stood to its credit in the New York Agency of the Swiss Bank Corporation. He also found that the cover account was not owned directly by a natural person. Having recited these determinations, he obeyed the mandate of the statute and vested the blocked bank account in the Attorney General.

At the time the Hungarian bank's New York account was vested, Mrs. Schrager-

1. Among the definitions of the term "national" in Executive Order 8389, as amended, 5 Fed.Reg. 1400, 12 U.S.C.A. § 95a note, is the following found in § 5, subd. E(i): "Any person who has been domiciled in, or a subject, citizen or resident of a foreign country at any time on or since the effective date of this Order. [April 10, 1940, as three times amended in 1941.]" Under this definition, Mrs. Schrager-Singer is a Rumanian national.

2. By Executive Order 10644, November 7, 1955 (20 Fed.Reg. 8363, November 9, 1955), 22 U.S.C.A. § 1631a note, the President designated the Attorney General and any Assistant Attorney General named by him to perform the functions imposed upon the President by the Act. By Order No. 106–55, November 23, 1955 (20 Fed.Reg. 8993, December 7, 1955), the Attorney General designated the Assistant Attorney General who had been theretofore named Director of the Office of Alien Property to perform the functions which had been delegated to him by the President.

Singer had left Rumania[3] but her deposits were still in the Hungarian bank and were among those "covered" by the larger sum which stood to the credit of the Hungarian bank in its New York account and which was vested by the Director's order. Because of this fact, she conceived she had a valid claim to the return of the vested bank account to the extent of her deposits in the Hungarian bank. Section 207 of the Act, 22 U.S.C. § 1631f, 69 Stat. 564, provides alternative methods by which the return of vested property may be sought:

(a) Under § 207(a) of the Act a claimant may file a suit in equity for the return of vested property, in which event he must allege in his complaint, and in order to prevail of course must prove,

"(1) that the claimant is a person other than Bulgaria, Hungary, or Rumania, or a national thereof as defined in Executive Order 8389 of April 10, 1940, as amended; and

"(2) that the claimant was the owner of such property immediately prior to its vesting, or is the successor in interest of such owner by inheritance, devise, or bequest."

Or (b) may proceed administratively under § 207(b) by filing with the Director a verified notice of claim for its return; in which event the Director may return the property claimed whenever he shall determine

"(1) that the claimant is a person other than Bulgaria, Hungary, or Rumania, or a national thereof as defined in Executive Order 8389 of April 10, 1940, as amended; and

"(2) that the claimant was the owner of such property immediately prior to its vesting, or is the successor in interest of such owner by inheritance, devise, or bequest."

Mrs. Schrager-Singer elected to proceed under the second of these two methods of seeking the return of vested property, that is, under the procedure provided by § 207(b). She filed on June 3, 1958, a notice of claim for the return of vested property, in which she said she was the owner of a part of the vested "cover" account of the Hungarian bank, and described the claimed property as follows:

"(1) $1,919.05 Passbook No. 2901 and (2) $122.41 Passbook No. 2902 with Hungarian Discount and Exchange Bank of Budapest (Hungary) sent by said Bank to Swiss Bank Corporation in New York, which kept the said sums together with other amounts in a cover account for the Hungarian Bank."

But she did not assert she was not a national of Bulgaria, Hungary or Rumania within the meaning of "national" as defined in Executive Order 8389. On the contrary, her notice of claim admitted she was, under the Executive Order, a national of Rumania, and had been continuously from her birth in 1917 until she left that country in 1957.

Because of her admission that she was a Rumanian national within the definition of the word "national" contained in Executive Order 8389, the Director was of course unable to determine Mrs. Schrager-Singer was not such national. Accordingly, in an order dated February 18, 1959, he found her "ineligible to receive a return of the vested property under Section 207(b) of the International Claims Settlement Act of 1949, as amended," and so dismissed and disallowed her claim. Mrs. Schrager-Singer petitions for review of that order.

In her petition for review, Mrs. Schrager-Singer contends her Rumanian nationality is immaterial because of her assertion that "Property owned by naural persons is outside the scope of Public Law 285 [The International Claims Settlement Act of 1949, as amended.]" She further says, "[T]he statute makes an express exception in favor of natural persons. Property owned by such persons is exempt from vesting."

3. She left that country September 22, 1957.

The petitioner was apparently referring to this portion of § 202(a):

" * * * Notwithstanding the preceding provisions of this subsection, any such [blocked] property *determined by the President or his designee* to be owned directly by a natural person shall not be vested under this subsection but shall remain blocked subject to release * * * ." (Emphasis added.)

Thus it is seen that the language quoted from the petition for review goes much too far, and that the most which can be said is that blocked property determined by the President or his designee to be directly owned by a natural person is not within the scope of § 202(a) of the Act and cannot be vested thereunder. It is also true, however, as we have pointed out, that blocked property unreviewably determined *not* to be owned directly by a natural person *shall* be vested.

■ Sections 202(a) and 207(b) differ sharply in their purposes and provisions. The former requires the vesting of blocked property owned by Bulgaria, Hungary, and Rumania or a national thereof, except that determined to be owned directly by a natural person. The latter prescribes an administrative procedure which may be followed by a claimant of property already vested, and permits the Director to return vested property to a claimant he finds to have been its owner—either directly or indirectly—immediately prior to vesting, provided the claimant is neither one of the countries named nor a national thereof.

Mrs. Schrager-Singer cannot obtain review of the vesting order entered pursuant to § 202(a), although she is a natural person and claims to have been, prior to vesting, the direct owner of the property in question. This is so because in the vesting order the Director determined the property described therein was not owned directly by a natural person; § 202(c) expressly states such a determination shall not be subject to judicial review because, as the Act's legislative history shows, the Congress did not want the process of vesting to be delayed or interrupted by litigation. So, the vesting of the Hungarian bank's New York account is complete and final, and may not be judicially reviewed at the instance of a national who is a natural person claiming to be the owner of a part of the vested account.

But Mrs. Schrager-Singer clearly had the right to claim the return of the vested property, or a part of it, under the terms of § 207(b). According to the literal language of § 207(b), however, she is not entitled to a return of the vested property—even if she was the owner of it immediately before vesting—because she is a Rumanian national under the Executive Order's definition. So, the question is whether, despite that literal language, a Rumanian national is entitled to the return of vested property simply because he is a natural person; that is to say, whether the prohibition of § 202(a) against vesting blocked property determined to be directly owned by a natural person extends to § 207(b) and permits vested property owned by a natural person to be returned to him, although he is a Rumanian national.

■ This question of statutory construction requires us to examine and compare the two sections of the Act. In § 202(a) Congress distinguished between nationals, giving exemption from vesting to property determined to be directly owned by natural persons, while requiring the blocked property of all other nationals to be vested. But in § 207(b) Congress made no such distinction between direct and indirect owners. It clearly provided, without qualification, that property which has been vested cannot be returned to a national of one of the three named countries, even though he owned it immediately before vesting. There is no exception in favor of natural persons determined to be direct owners.

This shows, we think, that Congress purposely as a matter of grace granted exemption from vesting to blocked property determined to have been owned by a national who is a natural person, and just as purposely withheld that grace with respect to the return of property

already vested. Had the legislators intended to permit the return of vested property to nationals who are natural persons and who are determined to have been the owners thereof immediately before vesting, we think the intention would have been expressed in § 207(b). Language even indicating such an intention is significantly absent from the latter section.

■ It appears to us, therefore, that the procedure for vesting blocked property set out in § 202(a) is quite different from that for the return of vested property contained in § 207(b), and that no provision of either section can be read into the other. Consequently, we hold that Mrs. Schrager-Singer's Rumanian nationality made her ineligible for the return of the claimed portion of the vested bank account, even if she had been the owner thereof just before vesting.

Sympathy for Mrs. Schrager-Singer, who describes herself as a penniless refugee, can be readily understood and shared. But, unfortunately for her, the statute seems clear that vested property cannot be returned to a national, even though he was its pre-vesting owner. Were it otherwise, the Director undoubtedly would have ruled against her on the ownership question, an issue which it seems he did not reach. He strongly intimated as much when on June 20, 1958, in advising her that Rumanian nationality was a bar to the return of vested property, he wrote, *"For the limited purposes of this letter,* you will be considered as the owner of that amount which you seek the return of in your Notice of Claim." (Emphasis added.)

According to the record, the relationship between the Hungarian bank and Mrs. Schrager-Singer was and still is that of debtor and creditor. As far as we know, the same relationship existed between the New York office of the Swiss Bank and the Hungarian bank. There is no connotation of bailment in the term "cover account," which we think simply means the Hungarian bank maintained a dollar account in New York so it could readily meet its obligations to its own dollar depositors such as Mrs. Schrager-Singer.

As between the New York Agency of the Swiss Bank and the petitioner, the record shows no relationship at all; the former was not shown to have been indebted to her, either directly or indirectly. In these circumstances, no part of the vested bank account could have been given to her, had she not been a Rumanian national.

Affirmed.