*826 Opinion
By the Review Panel:
By H. Res. 324, 91st Cong., 1st Sess., approved February 17,1970, the Blouse of Representatives referred to the Chief Commissioner of the Court of Claims, pursuant to 28 U.S.C. §§ 1492 and 2509 (1970), H.R. 8568, 91st Cong., 1st Sess., a bill for the relief of the heirs of Amadeu Ghitescu, “for further proceedings in accordance with applicable law.” The Chief Commissioner referred the case to Trial Commissioner David Schwartz for proceedings in accordance with the applicable rules, and designated the above-named members of the Review Panel to consider Commissioner Schwartz’ opinion on the merits of the matter.
Amadeu Ghitescu, a wealthy man in pre-World War II Rumania, was a political prisoner of the post-war communist Rumanian regime from 1952 to his death in 1961. In 1958, assets in the United States in a blocked account (termed, prior to blocking in 1940, the “A. Ghitescu Special Guaranty Account”)[1] were vested by defendant as the property of a satellite enemy Rumanian partnership in which Mr. Ghitescu and one Nicu Butculescu were partners.
In 1962, Mr. Ghitescu’s widow and children, plaintiffs herein, escaped from Rumania to France, and in February 1963 they unsuccessfully applied to the Office of Alien Property (OAP) for a divesting of the property vested in 1958. H.R. 8568, introduced March 10, 1969, proposes to repay to plaintiffs some $133,000, as “settlement in full of their claim arising out of the vesting of that amount representing money belonging to Amadeu Ghitescu.”
On October 31, 1972, following pretrial proceedings and trial, the trial commissioner filed a report containing his opinion, findings of fact, and ultimate findings and conclusions, on the basis of which he recommended the enactment of H.R. 8568 with a minor amendment. Both parties have excepted to the trial commissioner’s report. Defendant vigorously challenges the recommendation that H.R. 8568 be enacted at all, while plaintiffs contend that the minor modification suggested is inappropriate.
*827 The Review Panel has carefully considered the record, the trial commissioner’s report, the briefs and exceptions of the parties thereto, and the oral arguments of counsel for the parties. We acknowledge our indebtedness to the trial commissioner, whose findings of fact we have adopted in large part, and from whose reasoned opinion we have borrowed extensively. While we do not adopt that opinion in its entirety, we agree wholly with the result he reached.
Our conclusions in the matter are that plaintiffs have no legal claim but do have one which should be recognized from the standpoint of the conscience and honor of the sovereign; that in all of the circumstances their delay in pressing that claim should be forgiven; and that, accordingly, enactment of H. R. 8568, with minor amendments as to the amount to be paid and as to the source of payment, would be appropriate and not a mere gratuity.
Issues related to the passage of time, plaintiffs’ right to consideration of their claim on its merits, and the nature of the reference, dealing as it does with vested property, are detailed and discussed hereinafter. On the merits, the central issue is whether the account vested should equitably be deemed Mr. Ghiteseu’s individual property, either from and after the time of its creation in 1934, or in any event from the time of the dissolution of the partnership on the death of Mr. Butculescu in 1957, some 18 months prior to the vesting.
In this connection, defendant contends that the trial commissioner erred in not evaluating the reference by a “standard * * * limited * * * to the judicial concept of an ‘equitable claim,’ * * *” and suggests that § 2509 does not here encompass, or permit a report incorporating, considerations of “good conscience”.[2] Cf. Burt v. United States, 199 Ct. Cl. 897 (1972). We disagree.
In Burkhardt v. United States, 113 Ct. Cl. 658, 667, 84 F. Supp. 553, 559 (1949), the Court of Claims expressed the view that, as used in § 2509, the term “equitable claim” was not used in any strict technical sense to mean a claim in *828 volving consideration of principles of right and justice as administered by courts of equity, but in a broader moral sense based upon general equitable considerations. See also Rawlins v. United States, 197 Ct. Cl. 972, 986 (1972); Clarkson v. United States, 194 Ct. Cl. 963, 972 (1971); Southwest Metro. Water Dist., Colo. v. United States, 194 Ct. Cl. 994, 997 (1971); Messina v. United States, 193 Ct. Cl. 993, 996-98 (1970).
In 1958, defendant, acting in its sovereign capacity, vested, and thereafter utilized for governmental purposes, property which belonged either to Amadeu Ghitescu or, viewing the matter as favorably to defendant as possible, to a partnership in which he was a partner. Had that property been regarded at the time of vesting as “directly owned * * * by a natural person”, it would have been exempt from vesting.
Without pausing to attempt to define an “equitable claim” in terms sufficiently broad to encompass every possible matter that may be referred to the Chief Commissioner, it seems clear that, in the context of this reference, the basic issue, on the merits, is whether or not, in consequence of defendant’s actions with respect to that property, “the conscience and honor of the sovereign dictate that plaintiff [s] should receive compensation that is not recoverable under a legal cause of action.” Drake America Corp. v. United States, 168 Ct. Cl. 318, 326 (1964); see also O'Donnell v. United States, 166 Ct. Cl. 107, 117-18 (1964). And, it is equally clear that that question must here be answered in the affirmative.
The relevant statute is Title II of the International Claims Settlement Act of 1949, added by the Act of August 9,1955, 69 Stat. 562, 22 U.S.C. §§ 1631-1631n (1970), under which Rumanian Government and corporate property was vested and the proceeds paid into a Rumanian Claims Fund in the Treasury for the satisfaction of the claims of United States citizens for Rumanian nationalization and for war damage. Title II, here called Public Law 285, related to the property of all the satellite enemies, Rumania, Bulgaria and Hungary, but will here be described as though it related only to Rumania.
*829 THE PROBLEMS OP LIMITATIONS AND LACHES
Public Law 285 contains three 1-year time limitations. The first, a limit on the only remedy open to Rumanians such as Mr. Ghitescu and his family, is found in § 202 (a) .[3]
Section 202(a) opens with a sweeping authorization of the vesting of any Rumanian property, blocked during World War II under Executive Order 8889, which “was owned directly or indirectly by * * * Rumania or by any national thereof as defined in such Executive Order.” [4] Immediately thereafter, however, it provides that any property determined by the President or his designee, the Office of Alien Property (herein, together, called “the executive”) to be “owned directly by a natural person” should not be vested but remain blocked. It further provides that if within a year after a vesting the executive should determine that the property vested “was directly owned at the date of the vesting by a natural person,” the property or its proceeds should be divested and returned to blocked status.
The determination that vested property was not directly owned by a natural person at the date of vesting is, by *830 § 202(c),[5] within the sole discretion of the executive and “shall not be subject to review by any court.” A claimant is thus to have the right to apply to the executive, within a year after the vesting, to undo the vesting as mistaken, but there is no right to a judicial or judicially reviewable remedy for a mistaken vesting of individual property under § 202. Schrager-Singer v. Attorney General, 271 F. 2d 841 (D.C. Cir. 1959).
Limitation periods of 1 year are also found in § 210 of Public Law 285, applicable to the remedies afforded by §§ 207 (a) and (b) — a suit in district court and an administrative claim, judicially reviewable, for the return of vested property. 22 U.S.C. §§ 1631i, 1631f (a) and (b) (1970). By subsection (c) of § 207, the remedies in §§ 207(a) and (b) are to be the “sole relief and remedy” of any person having a claim to vested property. 22 U.S.C. § 1631f(c) (1970). Both claim and suit are restricted to claims for the return of non-Rumanian property mistakenly vested as Rumanian and to claimants who can prove that they are not nationals of Rumania. Bohrager-Binger v. Attorney General, supra. Those remedies were thus doubly unavailable to Mr. Ghitescu and his family.
There is no doubt that the 1-year period following vesting, in which application, claim, or suit for divesting might have been made, had expired long before the first steps on the claim were taken by any of the Grhitescus. The claim is concededly time-barred, and for this reason, and for others as well, plaintiffs have no legal claim.
Section 2509(c) requires, however, that the “facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not *831 having resorted to any established legal remedy” be determined in accordance with applicable rules and reported. The recognition and satisfaction of a claim meritorious as a matter of equity and good conscience is to be recommended to Congress though no legal claim exists. E.g., Clarkson v. United States, supra; Southwest Metro. Water Dist., Colo. v. United States, supra; Messina v. United States, supra; see also Bennett, Private Claims Acts and Congressional References, H. Comm. Print, 90th Cong., 2d Sess. (1968), 10.[6]
The facts of this case compel the conclusion that the conceded failure to apply for divesting within the period of limitations prescribed by § 202 (a) should be excused.
Mr. Ghitescu was a political prisoner in Rumania from 1952 to his death in 1961.- Even assuming his awareness of the 1958 vesting, any action on his part to attempt to obtain divesting, from prison, would appear to have been a practical impossibility. Moreover, the futility and even dangers of such an application in post-World War II communist Rumania would have operated as a clear deterrent to any such action were it otherwise practicable.
Prior to 1958, the Rumanian Government, by a series of decrees, had nationalized buildings and houses, had confiscated “abandoned” property, had substantially expropriated all industry and trade, with the exception of the smallest stores and shops, and had ordered foreign assets and claims to be reported and transferred to the national bank, in exchange for promised or nominal compensation in revalued currency at the rate of 1 new Rumanian “stabilized leu” for 20,000 old Rumanian lei. See Foreign Claims Settlement Commission Dec. & Ann. (227 — 28) (1968). If the money in the guaranty account, in the United States, had not been declared to the Rumanian authorities, as is likely, the making *832 of an application for divesting by Mr. Ghitescu, even if possible from prison, would have disclosed a violation of law and marked him in the eyes of his jailors as a capitalist. All in all, § 202(a)’s limitation period should not bar this claim. See Allison v. United States, 196. Ct. Cl. 263, 271, 451 F.2d 1035, 1039 (1971).
Still to be considered, however, is whether, notwithstanding that conclusion, the passage of time prior to the 1970 filing of the petition herein with the Chief Commissioner militates against the claim on its merits.[7]
Both limitations and laches are affirmative defenses, to be pleaded if appropriate. See Buie 37 (b), Buies of the United States Court of Claims, applicable to this reference pursuant to Paragraph 11(b), Procedure in Congressional Beference Cases, Appendix D thereto. Not until trial of this cause, when counsel for defendant endeavored to amend its answer to include the defenses of limitations and laches, were these matters mentioned.
The trial commissioner declined to permit the amendment at that stage and time, as coming too late and to plaintiffs’ prejudice if then allowed. Defendant did not request, or ask for time within which to seek, review of that ruling. Laehes is not mentioned in either defendant’s requested findings of fact or its brief to the trial commissioner. In his opinion, the trial commissioner discussed the statutes of limitations in Public Law 285, and the 6-year statute applicable to actions in the Court of Claims, and concluded that they were no bar to the claim. He did not, however, treat laches.
The defense of limitations is a jurisdictional one which should be considered in a Congressional reference case where appropriate even if not mentioned by the parties. McQuown v. United States, 199 Ct. Cl. 858 (1972); Todd v. United States, 155 Ct. Cl. 87, 93, 292 F.2d 841, 844 (1961). In contrast, laches is to be deemed waived if not pleaded. Todd v. United States, supra, 155 Ct. Cl. at 94, 292 F.2d at 845. The *833 trial commissioner properly refused to permit defendant to interject into this proceeding at trial a theretofore unmentioned issue, nor, in all the circumstances, did he err in failing to discuss, sua sponte, a question not presented to him in defendant’s brief.
While there is much to be said for the view that the foregoing considerations preclude any necessity for further discussion of laches, a majority of the Beview Panel is of the belief that, in this Congressional reference, the House may nonetheless wish to be apprised of the Panel’s conclusions respecting that question. Accordingly, despite defendant’s actions (and inactions) described above, consideration has been given to defendant’s present argument that delay between plaintiffs’ escape to France in 1962 and the introduction of private relief legislation in their behalf in 1969 justifies an adverse recommendation on H.B. 8568. On the facts available,[8] that argument is entirely unpersuasive.
Long prior to 1962, in plaintiffs’ native land, decrees which were designed to, and did, confiscate assets of the propertied classes of Bumania had been promulgated by the communist regime. In 1962, shortly after Mr. Ghitescu’s death, plaintiffs succeeded in escaping to France, but, it is clear that at the time, Bumanian authorities did not knowingly permit any property within their grasp to be removed by persons fleeing from that country.
In 1963, from France, plaintiffs did make an application to the OAP for divesting of the guaranty account, only to be advised by that office that the application was both too late and devoid of any merit. At that point in time, no possible remedy of either an administrative or a judicial nature existed for plaintiffs. Their sole hope for obtaining any redress could only have been a petition to the Congress for a dispensation of legislative grace. While the record does not show when initial efforts in that direction were first begun, it does *834 reflect that H.R. 8568 was introduced in the House of Representatives March 10, 1969, within less than 6 years after OAP’s denial of their application for divesting.
Laches is a flexible concept based on fairness, and even where properly raised is to be applied in the discretion of the court. Mere delay in asserting rights is not, in and of itself, sufficient to establish the defense. Cason v. United States, 200 Ct. Cl. 424, 471 F. 2d 1225 (1973) ; McQuown v. United States, supra, Todd v. United States, supra. To invoke the doctrine, defendant bears the burden of showing not only delay but also that it has been prejudiced by the inaction. Ibid.
Defendant did not see fit to plead the defense prior to trial. At trial, it made no offer of proof of any facts to sustain it. Indeed, it disavowed any factual basis for the defense. Even now, defendant simply points to the mere passage of time, without the slightest hint as to how it might have been prejudiced thereby. In all of the facts and circumstances of this case, the time which has elapsed cannot be deemed unreasonable, nor can it fairly be concluded that the claim is barred by laches.
THE PROBLEM OE LACK OE A PROBATE DECREE
Plaintiffs are the widow and children of Amadeu Ghitesou and undeniably would take his property in any Rumanian probate proceeding. Nevertheless, defendant urges, lack of a decree in a Rumanian probate proceeding determining their right to succeed to such property is a bar to their claim here.
The trial commissioner found that under Rumanian law a judicial proceeding and decree are ordinarily necessary to establish heirship, and no error in that finding is shown or apparent. Equitably, however, plaintiffs’ failure to institute such a proceeding in Rumania (or in this country) and to obtain a decree of succession does not bar them from the relief contemplated by H.R. 8568.
In support of defendant’s contention that this factor should lead to an unfavorable recommendation to the House of Representatives, it alludes to the absence of “legal right of *835 claimants to institute such, a suit as this in the Court of Claims without a probate decree * * and to “the necessity for a judicial decree as a proper prelude to this suit under Buie 61 (b) * * [9] Those arguments reflect a basic misapprehension of the nature of this proceeding, and tend to obscure the real issues presented by it.
Plaintiffs’ right to consideration of their claim does not depend solely, or even principally, upon their legal capacity to sue under Buie 61 (b) vel non. The power and right of the Congress to honor a claim for any assets of Amadeu Ghitescu over which defendant exercised dominion and control, by vesting them and paying them into the Bumanian Claims Fund, without requiring any probate or decree of succession, Bumanian or otherwise, if that be “equitable”, cannot seriously be doubted. The pivotal inquiry is whether or not plaintiffs’ claim is in fact fairly within the perimeters of that concept, as hereinabove defined, not whether they would be technically qualified to commence a legal action on the claim.
In considering whether that unquestionable power should be exercised in plaintiffs’ favor, it is relevant to reiterate that Mr. Ghitescu’s assets had been subjected to the confiscatory decrees of the Bumanian regime, and that he had been a prisoner of the regime for 9 years prior to his death. It is highly unlikely that at his death he still had any property in Bu-mania worthy of a probate proceeding. And it is unreasonable in the extreme to expect his widow to have instituted a probate proceeding in order to pass title to foreign assets, thereby disclosing to the regime that her husband had assets deposited in the United States for safekeeping, and attracting attention to herself as the widow of such a man as the regime deemed her husband to be.
Too, it would be unreasonable to expect plaintiffs to have instituted a probate proceeding in this country seeking to establish title to, in essence, a legally non-existent property right. Long prior to the time they left Bumania, the blocked guaranty account in the United States had been vested and paid into the Bumanian Claims Fund, and neither judicial *836 nor administrative avenues for changing that situation were open.
In such a situation as this it is honorable and just for those who have taken control of the property of a foreign decedent to overlook the failure of foreign heirs to obtain a formal decree of succession, and to award local assets on proof of heirship by other means. The GAP itself recognized this in 1963 by advising plaintiffs to apply to the Studebaker-Packard Motor Car Co., where Mr. Ghitescu had a credit account, and there is no question but that the sum involved was paid over. And, in this country, the Foreign Claims Settlement Commission has frequently paid the claims of heirs of persons who died abroad in circumstances where a decree of heirship would be unreasonably onerous to obtain. Foreign Claims Settlement Commission Dec. & Ann., supra, at 68 (claim of Flesch) ; 139 (claim of Finger) ; 503.
If plaintiffs are turned away for lack of a decree of heir-ship, they will have lost irretrievably property which may have been owned by their husband and father. The United States surely should not desire to perpetuate any inequity committed by it with respect to Mr. Ghitescu’s property, if such exists, by reliance upon pure technicality. As the wife and children of Amadeu Ghitescu, plaintiffs deserve to be regarded as his rightful heirs and as successors to his interest, if any, in property vested by the United ¡States and thereafter used for governmental purposes. Put another way, their claim to such property is no less valid than one by Mr. Ghitescu himself, despite the absence of any formal probate decree.
THE VESTING ORDER AND STATUTE AS A BAR TO THE CLAIM
Next, defendant puts up the vesting order and statute as a bar to inquiry into the question whether the guaranty account should now be treated as the personal, individual property of Amadeu Ghitescu in 1958. The contention does not bear close examination.
The first intention of Public Law 285 was to vest the property of the Government of Rumania and apply the *837 proceeds of its liquidation to the satisfaction of American claims for confiscation and war damage. Kumanian corporate property was added to the property to be vested because the confiscation of corporate property in Kumania was thought to make it virtually impossible to determine the rights of the former beneficial owners. Hearings on H.R. 6382 before the Senate Committee on Foreign Relations, July 8 and 11, 1955, 84th Cong., 1st Sess., 13.
Pursuant to § 202(a), property “owned directly by a natural person” was to be left unvested, and if it were vested by mistake, the executive was during the following year empowered to divest it. The reason the property of individuals was to be preserved for them was that “we do not wish to alienate the support of friendly nationals of Bulgaria, Hungary, and Rumania or impair their faith in the United States.” Assistant Secretary of State Thruston B. Morton, in Hearings on H.R. 6382, supra.
Consistently with the foregoing statutory purpose and provisions, the guaranty account was vested as the property of a partnership, considered by the OAP to be an entity akin to a corporation, with title to its assets. Vesting Order No. SA-260 of July 24,1958, recited determinations that the account was blocked property “owned directly or indirectly by N. Butculescu Societe en Commandite, a national of Rumania as defined in said Executive Order 8389, as amended,” and, also, that “the property described herein is not owned directly by a natural person.” Under § 202(c), the determination that the property was not individually owned was within “the sole discretion of the President or his designee”, and “not * * * subject to review by any court.” Citing § 202(c), the government now maintains that plaintiffs are in this proceeding engaged in a forbidden effort to challenge the determination in the vesting order.
It is, of course, clear that § 202 precludes any “legal” claim by plaintiffs. The present proceeding is in reality an inquiry, undertaken at the request of the House of Representatives, into the “equity” of their claim, and it will culminate solely in an advisory opinion to the referring House. See Glidden Co. v. Zdanok, 370 U.S. 530, 579, n. 51, 579-83 (1962).
*838 There is no challenge to the validity of the vesting order or to the extent of the authority to vest Bumanian property. The issue herein is not whether an application for divesting, if made within the year allowed, would have been approved, but rather whether plaintiffs have an “equitable” claim to vested property which, despite any delay which has occurred, should now be recognized.
The reason for the prohibition in § 202(c) of any review of the determination in the vesting order was that “as the Act’s legislative history shows, the Congress did not want the process of vesting to be delayed or interrupted by litigation.” Schrager-Singer v. Attorney General, supra, 271 F. 2d at 814. A report to Congress, now, upon request, will not affect the processes of vesting, which are long since concluded, nor constitute a “review” of the vesting order in violation of § 202(c). It will simply furnish a basis for decision by Congress whether or not, in equity and good conscience, it should dispense legislative grace, and as such is completely appropriate.
THE MERITS OE THE MATTER
The “A. Ghitescu Special Guaranty Account” was vested by defendant in 1958 as the property of a Bumanian partnership. Two possible issues on the merits emerge from that action. The first is whether, from and after creation of the account in 1934 with $100,000 of Mr. Ghitescu’s own money, it was (and remained) his own individual account, or instead was (or subsequently became) partnership property. The second is whether, even assuming the account to have been partnership property at the time of Mr. Butcu-lescu’s death in 1957, that portion of the account vested in 1958 should nonetheless equitably be treated as Mr. Ghitescu’s individual property as of the time of vesting. The facts bearing on these issues available to the trial commissioner and to the Beview Panel are largely stipulated, and understandably sparse.
In about 1931, Mr. Ghitescu and Mr. Butculescu became partners in a Bumanian partnership known as “N. Butculescu *839 Societe en Commandite.” Mr. Butculescu was tbe general partner and Mr. Ghitescu was a limited silent partner. They imported into Rumania Caterpillar tractors and other products. The partnership agreement is not in evidence. For purposes of this proceeding, it is agreed that each had a half interest in the partnership.
In 1934, on Caterpillar’s request that a cash deposit be made to back up its exports to the Rumanian partnership, “Mr. Ghitescu sent $100,000 from his own funds to Caterpillar for deposit in an account to be entitled ‘A. Ghitescu Special Guaranty Account.’ Thereafter the difference between list price, remitted from Rumania, and price at which Caterpillar merchandise was actually charged to the Rumanian purchaser, was added to this account, as well as remittances from other sources. It is not known whether these other remittances were individual property of one or another of the two partners or partnership property.” There was $267,474.28 credited to the account in 1940, at the time of blocking, when Caterpillar renamed it the “A. Ghitescu, Blocked Export Dealer Account No. 714.”
In Caterpillar’s reports to the Treasury under freezing regulations, it is stated that the “A. Ghitescu Special Guaranty Account” was the property of Amadeu Ghitescu, whose given address was different from that of the partnership; that the type of ownership was “Individual”; and that Nicu Butculescu “might have an interest in this property as he and Mr. Ghitescu work closely together. However, the extent and nature of that interest, if any, are unknown.”
Caterpillar also had on its books an account in the name of the partnership, containing only property of nominal value such as spare parts, and still another account, in the name of Mr. Butculescu individually, in which there was slightly over $50,000 at about the time of the blocking. In reporting this last account, Caterpillar noted that Mr. Ghitescu “might have an interest in this property as he and Mr. Butculescu work closely together. However, the extent and nature of that interest, if any, are unknown.” These other accounts were not vested.
*840 After Mr. Butculescu arrived in America, in 1948, OAP relinquished to him, on his applications, a total of some $53,-000 from the guaranty account for his use as living expenses. Following Mr. Butculescu’s death in 1957, at which time there was in the guaranty account $214,467, his estate claimed a half interest in that account, and subsequently received an amount (approximately $80,700) which, when added to the $53,000 already released to Mr. Butculescu, equaled half of the amount in the account at the time of its blocking in 1940. Mr. Butculescu’s estate thereupon gave a release of further claim on the account. The balance in the account ($133,737.14) was subsequently vested on the determination, heretofore described, that it was partnership property and not directly owned by a natural person.
The trial commissioner concluded (and defendant implicitly concedes) that Mr. Ghitescu owned the guaranty account at the time it was established. He also determined that no part of the guaranty account was at any time partnership property; that all of it was at all times individually owned property, perhaps partly owned by Mr. Butculescu; that, in view of Mr. Butculescu’s (and his estate’s) receipt of half the amount in the account and release of all claims against it prior to vesting, the balance in it was solely owned by Mr. Ghitescu at the time of vesting; and that, had an application for divesting been made by Mr. Ghitescu within 1 year from the date of vesting, the property would have been determined to be “directly owned at the date of vesting by a natural person” and divested.
The trial commissioner also concluded, however, that “the guaranty account, if it was originally partnership property * * * became individual property no later than 1957, before the issuance of the vesting order in 1958.” The essence of his reasoning on the latter phase of the matter appears in the six paragraphs immediately following.
Rumanian law provides that a limited partnership is a legal entity, with title to its assets, and that neither entity nor title terminates automatically on the dissolution of the partnership by the death of a partner. Under the Rumanian Commercial Code, dissolution of a partnership is usually *841 followed by a period of liquidation of tbe assets for the •benefit of the creditors, at the conclusion of which the net assets are judicially distributed to the remaining partners and their heirs. Only upon such distribution does the partnership entity come to an end and title to partnership assets pass to individuals.
On these principles defendant contends that since no proceedings to liquidate the partnership took place, title to the account (claimed by defendant to be originally in the partnership) remained with the partnership and never passed to the partners individually. This line of argument overlooks that the circumstances prevailing in Rumania on Mr. But-culescu’s death differed vastly from those that would have prevailed in normal, pre-war, times.
By 1957 most private business in that country had been confiscated. The content of the Commercial Code had been or in any event was being replaced by “socialistic” content, and the courts administering the Commercial Code, in which liquidation might take place, were severely limited in their operations.
Moreover, the partnership had long since lost all viability. Imports of American machinery had ceased in 1939. One of the two partners had emigrated to the United States in 1948, and the other had been in jail in Rumania since 1952. Any Rumanian partnership assets as may have survived the war and post-war confiscation had doubtless been consumed and liquidated de facto by the partners and their families long before 1957. It can safely be concluded that by 1957 the partnership had no existence — that it had neither activities, creditors, nor assets in Rumania.[10]
Even in normal times a Rumanian court would not entertain proceedings to liquidate a partnership which had neither assets nor creditors. Thus, formal liquidation proceedings for tins partnership in 1957, at the time Mr. Butculescu died in America, would in all likelihood have been impossible even for one not captive, and in any event useless.
*842 The only possible purpose of technical liquidation proceedings, if a Rumanian court were to entertain them, would have been to pass to creditors or to individuals connected with the partnership the title to the partnership’s foreign assets. For reasons heretofore set forth in connection with the limitations and heirship problems, it would be unreasonable, in all the circumstances, to expect Amadeu Ghitescu from his cell at the time, or his heirs after his death in 1961, to institute proceedings for such a purpose. Feasibility aside, the dangers and inutility are equally clear here. Proceedings could only have created risks for those involved, with no real possibility of gain. See Allison v. United States, supra.
Equitably viewed, then, the partnership should be regarded as de facto dissolved and liquidated in 1957, at the latest. Thus, on the technical dissolution of the partnership by the death of Nicu Butculescu in 1957, title to any assets it may have had in the United States should be regarded in equity and good conscience as belonging to the surviving partner and the successors of the deceased partner.
Considering the foregoing, the Review Panel is of the opinion that in 1958 defendant, by vesting, exercised dominion over property which, in equity and good conscience, should be regarded as being individual property at that time, and which, therefore, should now equitably be “divested.” It follows that plaintiffs’ claim addressed to the honor and conscience of the sovereign is a valid one. There is, therefore, no need to reach the difficult question whether the guaranty account was at all times individually owned property.
There is, too, no need to discuss plaintiffs’ further contentions that vesting under Public Law 285 was intended to be limited to corporations and not to include partnerships; that even if the account was properly vested as partnership property, Amadeu Ghitescu’s share in it should have been returned under § 207 (c) of Public Law 285 (22 U.S.C. § 1681f (c)) which provides for partial returns to stockholders of vested corporate property; and that in any event simple equity requires that the Ghitescus be treated equally with the Butculescus, to whom one-half of the account was paid by decision of the OAP.
*843 FUNDS FOR PAYMENT OF THE CLAIM
H.R. 8868 denominates as a source of funds for payment to plaintiffs “tbe moneys deposited pursuant to tbe Agreement between tbe United States and Rumania signed at Washington March 30, 1960 * * Tbe trial commissioner observed that approximately half of tbe $2,500,000 paid by tbe Rumanian Government pursuant to tbe 1960 agreement “is presently held in tbe Rumanian Claims Fund, awaiting tbe disposition of Congress * * *” and was therefore available for satisfaction of plaintiffs’ claim, should Congress conclude to recognize and satisfy it.
Defendant’s brief to tbe Review Panel alludes to advice from tbe Bureau of Accounts, Treasury Department, that “as of June 30, 1972 there was a balance of $43,473.55 in tbe Rumanian fund which amount has been fully obligated. ”[11] No reason to doubt that statement appears. Accordingly, if tbe Congress deems tbe claim herein one which should be satisfied, H.R. 8568 should be amended to include provisions for payment from “tbe net proceeds of any other interest representing vested property”,[12] or from other funds should Congress so desire.
THE AMOUNT VESTED
H.R. 8568 proposes that plaintiffs be paid from the Rumanian 'Claims Fimd the sum of $133,737.14, the amount actually vested. As the trial commissioner noted, however, only $132,399.77 was paid into the Rumanian Claims Fund as the proceeds of vesting. The balance, $1,337.37, was retained for the 'administrative expenses of the CAP. He concluded that such expenses were “payable without question,” that the correct amount to be paid plaintiffs from the Fund was thus $132,399.77, and that H.R. 8568 should therefore be amended accordingly.
Plaintiffs urge that § 202, the statutory provision pertain *844 ing to “executive” divestments, contains no authority to deduct administrative charges, and that the trial commissioner’s recommendation for amendment as to amount is therefore improper. It suffices to say that the trial commissioner’s conclusion in this respect comports fully with considerations of equity and good conscience, and it is therefore approved by the Review Panel.
In sum, plaintiffs have no legal claim for several reasons. As a matter of equity and good conscience, however, they do have a meritorious claim, and the circumstances are such that their delay in pressing that claim should be excused. It is accordingly concluded that enactment of H.R. 8568, modified as 'hereinabove suggested, would be appropriate and not a mere gratuity.
This determination is submitted to the Chief Commissioner for transmission to the House of Representatives.

 That account hail been established in 1934 on the boohs of the Caterpillar Tractor Co. of Illinois.

 Defendant’s Brief, p. 23.

 Section 202(a) (22 U.S.C. § 1631a(a) (1970)) provided:
“* * * any property which was blocked in accordance with Executive Order 8389 of April 10, 1940, as amended, and remains blocked on August 9,1955, and which, as of September 1,5, 1947, was owned directly or indirectly by * * * Rumania or by any national thereof as defined in such Executive Order, shall vest * * * when, as, and upon such terms as the President or his designee shall direct. * * * The net proceeds remaining upon completion of the administration and liquidation thereof * * * shall be covered into the Treasury. Notwithstanding the preceding provisions of this subsection, any such property determined by the President or his designee to be owned directly by a natural person shall not be vested under this subsection but shall remain blocked subject to release when, as, and upon such terms as the President or his designee may prescribe. If, at any time within one year from the date of the vesting of any property under this subsection, the President or his designee shall determine that it was directly owned at the date of vesting by a natural person, then the President or his designee shall divest such property and restore it to its blocked status prior to vesting, subject to release when, as, and upon such terms as the President or his designee may prescribe * *

 Executive Order 8389 of April 10, 1940, was amended effective October 9, 1940, to include Rumania among the foreign countries designated in the order. 5 F.R. 1400, 4062 (1940) ; full text at 12 U.S.C. § 95a note.
Section 5E of the order defines the term national as including:
“(i) Any person who has been domiciled in, or a subject, citizen or resident *830 of a foreign country at any time on or since tlie effective Sate of tliis Order.
“(ii) Any partnership, association, corporation or other organization, organized under the laws of, or which on or since the effective date of this Order had or has had its principal place of business in such foreign country, or which * * * was or has been * * * owned or controlled by, directly or indirectly, such foreign country and/or one or more nationals thereof as herein defined * *

 Section 202(c) (22 U.S.C. § 1631a(c) (1970)) provided:
“The determination under this section that any vested property was not directly owned by a natural person at the date of vesting shall be within the sole discretion of the President or his designee and shall not be subject to review by any court.”

 Equitable considerations Rave a special place in tbe determination of questions affecting limitations in this case. The Supreme Court has held that under such a statute as the Trading with the Enemy Act (on which Public Law 285 is modeled), where assets go not into the Treasury but to creditors and private claimants (as they do under Public Law 285), limitations are to be applied less strictly than in suits against the assets of the sovereign, and thus that equitable considerations may serve to toll the running of limitations. Honda v. Clark, 386 U.S. 484 (1967).

 At least to plaintiffs’ escape from Rumania in mid-1982, any inaction •with respect to the account was, for reasons heretofore stated in connection with Mr. Ghlteseu’s failure to apply for divesting, equally excusable.

 Counsel for defendant stated at trial that “the issue [sic] raised by me is a question of law and of law only, * * and, in defendant’s brief to the Review Panel, defendant reiterates that its effort to raise at trial limitations and laches raised no “factual issues * * Befendant’s Brief, p. 5. It is thus reasonable to assume that the available facts are all of the facts.

 Defendant’s Brief, p. 6.

 American creditors of tlie partnership, it may be noted, were, under Public Law 285, as under the Trading with the Enemy Act, able to satisfy their claims from the proceeds of the vested account. Section 3, Public Law 285, 22 U.S.C. § 1631g (1970).

 Defendant’s Brief, p. 22.

 See. 216, Title II, International Claims Settlement Act of 1949, added by tbe Act of July 24, 1968, 82 Stat. 420, 421, Public Law 90-421, 22 U.S.C. § 1631o (1970).