# Congressional Power to Provide for the Vesting of Iranian Deposits in Foreign Branches of United States Banks

Congress has the power under Article I, § 8 of the Constitution to authorize the peacetime vesting of assets of a foreign government in the control of foreign branches of American-owned and incorporated banks, at least insofar as such power may be enforced by courts of the United States.

The Just Compensation Clause of the Fifth Amendment does not prohibit the United States from effecting uncompensated seizures of the assets of foreign nations.

While United States courts will ordinarily make every effort to construe statutes to accord with our treaty obligations and general international law principles, Congress may, by clearly expressing its intent to do so, legislate in derogation of international law or contrary to prior treaty obligations. Therefore, a United States court would likely enforce a vesting order directed at overseas deposits of a foreign government that was clearly authorized by Congress notwithstanding contrary treaties or principles of international law.

Congress could provide for the seizure in this country of Iran's overseas deposits by permitting vesting orders to be served against the New York office of the banks involved; however, foreign courts may refuse to give effect to what would appear to be the United States' uncompensated extraterritorial appropriation of non-enemy assets in any suit brought by Iran to recover its deposits.

September 16, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum considers Congress' power to provide for the vesting by the United States of currently blocked Iranian U.S. dollar deposits [1] in the foreign branches of United States banks. We analyze, first, Congress' power *per se* to authorize such a seizure, and second, the problems that Congress would face in providing for the vesting of the Iranian deposits in a feasible and effective manner. We believe Congress has the power to authorize this vesting, but that the vesting of Iran's deposits might ultimately subject the United States to liability under the Fifth Amendment for compensating the banks if they are successfully sued by Iran in foreign courts.

---

[1] For convenience, we refer in this memorandum to the government of Iran, its instrumentalities and controlled entities, and the Central Bank of Iran, collectively, as "Iran," and the interest of the government of Iran in the deposits of any of these entities as "Iran's deposits." Unless otherwise specified, we intend the term "Iran's deposits" to refer to Iran's U.S. dollar deposits in the foreign branches of U.S. banks.

# I.

In response to events in Iran, the President, on November 14, 1979, issued Executive Order No. 12,170, 3 C.F.R. 457 (1979), declaring a national emergency and ordering the blocking of:

> all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

Within hours of the President's order, the Department of the Treasury issued implementing regulations, the Iranian Assets Control Regulations, 44 Fed. Reg. 65,956 (1979), *to be codified at* 31 C.F.R. § 535, blocking the transfer to Iran of any property covered by Executive Order No. 12,170. These assets include deposits of dollars in the foreign branches of U.S. banks, principally in London and Paris.

Whether Congress has the legislative power *per se* to provide for the United States to "vest" or seize these blocked overseas deposits depends on three elements: congressional power to legislate concerning the subject matter; Congress' power to regulate the behavior of the foreign branches of U.S. banks; and the absence of any constitutional prohibition against this vesting. If these elements obtain, then Congress would have authority to provide for the vesting of Iran's deposits, at least as that authority can be recognized and would be enforced by U.S. courts.

We do not think a serious question exists as to Congress' constitutional power to legislate with respect to the assets of a foreign government in the control of U.S. persons. The constitutionality of the only legislative vesting authority now extant—war-time vesting authority under the Trading with the Enemy Act (TWEA), 50 U.S.C. App. § 1 *et seq.*—has been upheld as part of Congress' powers with respect to the conduct of war, *Stoehr* v. *Wallace,* 255 U.S. 239 (1921), and we are aware of no judicial decision that specifies a particular source of congressional power to authorize the vesting of non-enemy assets in peacetime. The United States has, however, apparently without judicial challenge, vested a steel mill belonging to Czechoslovakia, a country with which we were not at war, in order to settle claims against that country. International Claims Settlement Act of 1949, 22 U.S.C. §§ 1642–1642p. In addition, Congress has provided authority since 1933 that would permit at least the freezing of foreign non-enemy assets in national emergencies other than war, *e.g.,* International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701–1706 (Supp. I 1977). Such legislation—which would seemingly have to rest on legislative subject-matter authority sufficient to encompass legislation authorizing

266

the seizure of those same assets—has been upheld in the courts. *See Nielsen* v. *Secretary of the Treasury,* 424 F.2d 833 (D.C. Cir. 1970), and *Sardino* v. *Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir.), *cert. denied,* 385 U.S. 898 (1966), both dealing with the Cuban Assets Control Regulations, 31 C.F.R. § 515 (1979).[2] We infer from this history that Congress' power to regulate commerce with foreign nationals, U.S. Const., Art. I, § 8, cl. 3, alone or together with Congress' other Article I, § 8 powers, would provide it with power sufficient to legislate concerning the vesting by the United States in peacetime of Iranian assets in the possession or control of U.S. persons.

In addition, insofar as vesting would constitute legislative control of the activities of the overseas branches of U.S. banks, the overseas location of these branches is not a bar to legislation. The United States has authority to exercise jurisdiction over its nationals abroad. *Blackmer* v. *United States,* 284 U.S. 421 (1932) (upholding contempt against U.S. citizen residing in France for failure to respond to D.C. Supreme Court supoena); *Cook* v. *Tait,* 265 U.S. 47 (1924) (upholding tax levied against non-resident U.S. citizen for income from property located outside the United States). Although international law principles are unsettled for determining the nationality of corporations, the generally accepted U.S. rule is that corporations have the nationality of the states that create them. *See* Craig, *Application of the Trading with the Enemy Act to Foreign Corporations Owned by Americans: Reflections on Fruehauf* v. *Massardy,* 83 Harv. L. Rev. 579, 589–92 (1970) (hereafter *Craig*). Were Congress to express its intent specifically to treat as "United States persons" American-owned and incorporated foreign branches of U.S. banks, its determination would be upheld in the courts. As the Supreme Court has stated in related context, such a branch bank:

> is not a separate entity in the sense that it is insulated from [its head office's] managerial prerogatives. [The New York head office] has actual, practical control over its branches; it is organized under a federal statute, 12 U.S.C. § 24, which authorizes it "To sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons"—as one entity, not branch by branch. The branch bank's affairs are, therefore, as much within

---

[2] In 1964, Congress amended the International Claims Settlement Act of 1949 to authorize the vesting of Cuban assets frozen under the Cuban Assets Control Regulations. Pub. L. No. 88-666, 78 Stat. 1110. Congress, however, repealed this vesting authority, which had not been employed, the following year, Pub. L. No. 89-262, 79 Stat. 988 (1965), because the Johnson Administration urged that the vesting and sale of Cuban property would jeopardize our encouragement of foreign investment in the United States and the protections afforded by other nations to U.S. assets abroad. S. Rep. No. 701, 89th Cong., 1st Sess. 3 (1965). The State Department had, in fact, opposed the passage of vesting authority in the first place, but, although this Department deferred to State regarding support for the bill, this Office specifically opposed any language in the signing statement casting doubt on the constitutionality of the law.

the reach of the *in personam* order entered by the District Court as are those of the head office.

*United States* v. *First National City Bank* [*Citibank*], 379 U.S. 378, 384 (1965). In the *Citibank* case, the Supreme Court upheld the district court's authority, in a suit by the United States to enforce a tax lien against an Uruguayan corporation, to issue a preliminary injunction against the head office of Citibank ordering it not to transfer to the corporation any corporate assets on deposit with the Montevideo branch of Citibank. The same result would follow under judicial decisions enforcing subpoenas against U.S. banks for the production of records in the hands of foreign branches. *United States* v. *First National City Bank,* 396 F.2d 897 (2d Cir. 1968); *First National City Bank of New York* v. *Internal Revenue Service,* 271 F.2d 616 (2d Cir. 1959).

Finally, we note that the Constitution does not prohibit the uncompensated seizure of the assets of foreign governments. The Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation." On its face, the textual reference to private property excludes foreign governments from the protection of the Just Compensation Clause. The role of the Constitution in domestic law buttresses this reading. Constitutional protections limit the power of the United States to act upon persons who are subject to its legal authority by virtue of their citizenship or presence in this country. The United States, however, asserts its powers with respect to foreign nations not by virtue of its domestic political authority, but because, as a sovereign nation among equals, it enjoys powers and privileges under international law. Conversely, the rights of foreign states in this country depend not on constitutional protections, but on treaties, international custom, and such privileges as this nation extends under principles of comity. *Cf. Banco Nacional de Cuba* v. *Sabbatino,* 376 U.S. 398 (1964).

It may be argued that the peacetime seizure by the United States of Iranian assets would violate particular treaties or general principles of international law. It should be noted, however, that, even under such circumstances, Congress' express determination to authorize peacetime vesting would be enforceable in U.S. courts. Although our courts will ordinarily make every effort to construe statutes to accord with our treaty obligations and general international law principles, *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21-2 (1963); *Lauritzen* v. *Larsen,* 345 U.S. 571, 578 (1953), Congress may, by clearly expressing its intent to do so, legislate in derogation of international law or contrary to prior treaty obligations. *Rainey* v. *United States,* 232 U.S. 310 (1914); *Whitney* v. *Robertson,* 124 U.S. 190 (1888). In sum, insofar as such power may be enforced by U.S. courts, we conclude that Congress does have the power to authorize the vesting of Iranian dollar deposits in the foreign branches of U.S. banks.

## II.

Should Congress attempt to draft legislation authorizing the seizure of the Iranian deposits, it would face additional critical questions in attempting to provide for a feasible and effective vesting procedure. Whether vesting could be made feasible, in short, depends upon whether vesting could be effected by the Executive with the sole assistance of United States courts, or whether the assent of the courts of those nations in which Iran's deposits are located would also be required to secure transfers of title. Iran probably will seek injunctive relief in foreign courts to prevent the seizure of Iranian assets, and the banks, in any event, might seek declaratory judgments abroad authorizing their compliance with the vesting orders. Such suits would, of course, involve jurisdictional conflicts of the first order, and foreign courts might well refuse to give effect to what, from their point of view, would appear to be the United States' uncompensated extraterritorial expropriation of non-enemy assets, in possible disregard of general principles of international law. The United States Supreme Court has already expressed this country's judicial policy of not giving effect to foreign government's uncompensated expropriations of assets located in the United States. *Alfred Dunhill of London, Inc.* v. *Republic of Cuba,* 425 U.S. 682, 686–87 (1976). *Cf. Fruehauf* v. *Massardy,* (1968) D.S. Jur. 147, (1965) J.C.P. II 14,274bis (Cour d'appel, Paris), discussed in *Craig, supra.*

A strong argument can be made, however, that Congress can lawfully provide for the seizure in this country of the overseas deposits by permitting the vesting orders to be served against the head offices of the banks involved, which are located in New York. Foreign branches of U.S. banks and the U.S. head offices of those banks may, of course, be treated as separate entities under state law. *Sokoloff* v. *National City Bank of New York,* 239 N.Y. 158, 145 N.E. 917 (1924). Congress, however, may provide that national banks and their foreign branches shall be treated as unified entities for purposes of federal law. *See* the *Citibank* cases, discussed *supra.* That the New York head offices of the banks holding Iran's overseas deposits have actual control of those deposits is strongly suggested by the arrangements through which such deposits are made and controlled.

First, although individual deposits may have differed in their details, the deposits in question typically did not involve any transfer of currency overseas to any foreign branch of a U.S. bank. The only transfers of funds occurred in New York when funds owed to Iran or being held for Iran by banks other than Iran's depository bank were transferred to the head office of the depository bank in New York. Upon such transfer, the head office would direct one of its overseas branches to credit Iran with a deposit in the overseas branch equal to the amount of the transfer. The head office, in turn, would credit the transferred funds

to a "cover account" in the name of its foreign branch to secure the foreign branch's obligation to repay Iran on demand overseas for the amount on deposit.[3] An advantage of this scheme for Iran appears to have been that it enabled Iran to keep funds on deposit in interest-bearing checking accounts abroad, which would not have been possible in the United States, while at the same time keeping the funds available to a New York bank to finance Iran's transactions here.

Further, it appears, at least in certain instances, that head office banks in New York could draw, in New York, on Iran's foreign branch deposits for the benefit of Iran. We understand that, for example, if directions from Bank Markazi or the National Iranian Oil Company to Chase Manhattan's head office to make particular payments resulted in an overdraft, the head office—without further notice or its depositor's further consent—could cover the overdraft by withdrawing funds from the depositor's London account. It is even possible in theory that, in some cases, Iran and its banks agreed that the deposits *in toto* would be repayable to Iran on demand in New York.

These facts would readily justify a decision by Congress to treat Iran's overseas deposits in the foreign branches of U.S. banks as being within the control of, and therefore "present" in, the U.S. offices of those banks as well. It is the ordinary rule that a debt follows the debtor and, insofar as a national bank and its foreign branches are all one entity, that bank, as a debtor to its depositors, is present both here and overseas. The Supreme Court expressly recognized the possibility of dual-situs debts in *Cities Service Co.* v. *McGrath,* 342 U.S. 330 (1952). In that case, the Court unanimously upheld, under the Trading with the Enemy Act, the vesting of two gold debentures issued by Cities Service Company, a U.S. corporation, although one debenture was located outside the United States. The Supreme Court said:

> [T]he obligor . . . is within the United States and the obligation of which the debenture is evidence can be effectively dealt with through the exercise of jurisdiction over that petitioner.

342 U.S. at 334. In our judgment, the exercise of jurisdiction over national banks in the United States to seize debts to Iran that are evidenced by bank records abroad would present a precisely analogous case, and would equally "transgress[  ] no constitutional limitation[  ] on [Congress'] jurisdiction." *Id.*

The seizure in the United States of Iran's overseas bank deposits would, of course, not forestall attempts by Iran in foreign courts to recover its deposits. Although this country's ability to provide the

---

[3] Although no reported judicial decision is definitive on this point, it appears from those cases involving "cover accounts" such as these that the original depositor has no ownership interest in the cover accounts. If so, it would not be useful for the United States to seize the cover accounts. *See Schrager-Singer* v. *Attorney General of the United States,* 271 F.2d 841 (D.C. Cir. 1959).

banks with a complete defense to such actions would be enhanced if Iran's deposits were seized within U.S. territory, we understand that the legal disputes would be heated. At least three core issues would be involved in any overseas suits that Iran would bring to recover its deposits:

> 1. Whether the foreign situs nations should excuse performance of the branch banks' obligations because elements of performance would be required in the United States and U.S. law will have rendered those elements impossible to perform;

> 2. Whether the foreign courts should recognize the validity of U.S. vesting as consistent with their nations' public policy both specifically with respect to Iran and generally with respect to commonly accepted principles of international law; and

> 3. Whether the foreign courts should recognize the validity of U.S. vesting as a matter of comity.

In arguing for the validity of its vesting, the United States would likely assert the United States' predominant interest in the operation of the branch banks, the involvement of paramount U.S. foreign policy and national security concerns, foreign condemnation of the Iranians' actions, the hardship that foreign enforcement of the banks' obligations would pose for the banks and for the international monetary system, and the acceptability of reprisal under international law. The most serious doubts exist, however, as to whether these arguments would prevail in a foreign forum. Foreign courts might well view the banks' obligations as wholly performable abroad. They might perceive that their own nations' interests are significantly at stake in being able to assure foreign depositors the security of their deposits. The courts might fear that the U.S. vesting itself would destabilize the world monetary system, and would recognize that the United States would not likely give effect to other nations' extraterritorial seizures of property in the United States. How foreign courts would reconcile these competing considerations in suits by Iran is at best uncertain.

In this connection, we think you should be aware that seven of the nine Justices deciding *Cities Service Co.* v. *McGrath, supra,* conditioned their judgment regarding the constitutionality of this country's seizure here of the overseas gold debentures on the obligor's implicit right under the Fifth Amendment to recoup from the United States the extent of any liability imposed abroad in connection with the seized obligation.[4] 342 U.S. at 333–36. We believe the same result would likely obtain if Iran were to succeed, subsequent to our vesting, in a foreign suit against the banks for the recovery of Iran's deposits. The banks would be able to involve sympathetically the Supreme Court's recogni-

---

[4]The remaining two Justices would have reserved the question. 342 U.S. at 336.

271

tion that the "Fifth Amendment's guarantee . . . [is] designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States,* 364 U.S. 40, 49 (1960).

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

272